THE SECOND UNIVERSALIST SOCIETY OF THE CITY OF BALTIMORE *vs.* PIERRE C. DUGAN.

*Trust deed—Legislative power—Diversion of Property from Uses declared—Reverter—Intention—Article 34 of Bill of Rights—Covenant of General Warranty—Equity—Purchaser—Doubtful title.*

Where a deed conveys to certain uses, and not an indefeasible title, and in consequence of the diversion of the property from the uses to which it was conveyed, any reverter thereof would occur to the grantor and his heirs-at-law, an Act of the Legislature authorizing the grantees to dispose of the property absolutely, cannot have the effect of divesting vested rights of individuals, and thus make the alienation pursuant to the Act, effectual in confirming a good and indefeasible title.

The intention of a deed must be gathered from the expressions of the whole instrument; and it is to be construed most beneficially for the grantee. But it cannot be supposed an intention existed to grant what the *cestuis que trust* could not take under the prohibition of the Declaration of Rights, (Article 34.)

The covenant of general warranty is to be construed with reference to the estate and interest which is described as conveyed; and which the *habendum* clause limits; and the obligation to assure which is thereby created, can and should only be held to be an obligation to assure the precise estate granted in the deed, and nothing more. Being co-extensive with the estate granted, it ceases when that ceases.

The introduction of the word "grant" into a covenant of warranty, cannot enlarge the operation of the covenant beyond that for which it was introduced and was intended, viz., to assure the particular estate granted; it cannot make it a new granting clause.

Equity will not compel a purchaser to take a title which is not free from reasonable doubt, and which might in reasonable probability expose him to the hazards of litigation.

APPEAL from the Circuit Court of Baltimore City.

The case is stated in the opinion of the Court.

The cause was argued before ALVEY, C. J., MILLER, IRVING, RITCHIE, and BRYAN, J.

*Frederick W. Story,* and *Edward Otis Hinkley,* for the appellant.

Whatever restriction might (by any construction) be inferred from the *uses* set forth in the earlier portions of exhibits F and G, as to the land in question, it is *negatived* by the covenants of seizin and *general* warranty following—the latter covenant containing a " further grant " in the broadest possible language without any reservation whatsoever to " warrant and defend the same, (not the ' premises,' but ' the said piece or part of a tract of land,') not only for *themselves* but against *all and every person or persons whatsoever."*

In the event of a disseizin, this appellant, (as assignee of the covenantees therein,) would have an action against the heirs of Stigar and Deaver, respectively, for breach of the covenants. Thus *estopping* the covenantor and his heirs from *themselves* attempting such disseizin. For the grantee or assignee of a warrantee in a covenant of warranty may maintain an action against the remote warrantor, and the covenant of general warranty runs with the land. *Crisfield vs. Storr,* 36 *Md.,* 129, 148.

These deeds should be construed most strongly *against the grantor. Budd vs. Brooke,* 3 *Gill,* 198, 222.

And this construction should give effect, if possible, to every part of the instrument, reconciling all differences to effectuate the intention of the parties as ascertained from the entire deed, if it can be done. *Shultz vs. Young,* 3 *Iredell, Law, (N. C.,)* 385 ; *Frost vs. Spaulding,* 19 *Pick.,* 445; *City of Alton vs. Ill. Transportation Company,* 12 *Ill.,* 38; *Sweet vs. Brown,* 12 *Metcalf, (Mass.,)* 175.

It is apparent that in this case, nothing but the passage of the title *without reservation of interest by the grantor* can satisfy the "further covenant and grant" with general warranty.

In *Reed, et al. vs. Stouffer, et al.*, 56 *Md.*, 236, relied upon by the appellee—the *valid* (or second) deed from Howard to Kimmell, and others, trustees, contained *no covenants*, general or special. But it declares *in terms* that "it was and is the true intent of the said J. E. H., that the said lot of ground should at all times thereafter be used" for the particular use therein set forth; and the *habendum* is "in trust, nevertheless, to and for the uses, intents and purposes hereinbefore mentioned, and *to and for no other use, intent or purpose whatever*."

That deed is far different in all its provisions from the deeds, exhibits F and G, in this present case, which latter (except for the trust clause in the *habendum*) differ in no material respect from the broadest form of "deed with general warranty."

In any event the appellant's title is good by adversary possession (as admitted) since 1859, a period of nearly twenty-seven years.

*Michael A. Mullin*, for the appellee.

All the early deeds mentioned in the "case stated," expressly limit the uses to which the land conveyed was to be applied.

The diversion of the property from these uses re-invested the heirs of the grantors with the title to the land. *Reed, et al. vs. Stouffer, et al.*, 56 *Md.*, 236.

The covenants of warranty and for further assurances can only relate to and operate to assure the interest and estate which is described as conveyed. *Zittle vs. Weller*, 63 *Md.*, 198.

It was a familiar principle that warranty could not enlarge an estate.. *Coke Littleton*, 385*b; Seymour's Case*,

10 *Coke* 97, (*4th Res.*) ; 1 *Sheph. Touchstone*, (*Preston's Ed.,*) 182. Nor, can the modern covenants for title. *Rawle on Cov. of Title*, 415 ; *Hurd vs. Cushing*, 7 *Pick.*, 169 ; *Kendall vs. Brown*, 7 *Gray*, 212 ; *Adams vs. Ross*, 1 *Vroom*, 505 ; *Register vs. Rowell*, 3 *Jones*, (*N. C.,*) 312.

A warranty created a defence only and not a title. In modern practice a warranty is rarely of advantage to a title. A title depending on a warranty cannot be treated as a secure title. *Preston's Shep. Touch.*, (30 *Law Lib.,*) 181, 182.

The use of the term "grant" in the covenant adds nothing to the conveyance. It is found in nearly all the covenants in the old deeds in Maryland, and seems to have been in general use in the forms of such covenants elsewhere, the usual form being, " do covenant, grant and agree." *Compleat Clerk*, (1683,) 2, 3, 5, *&c.;* 1 *Covert's Scrivener's Guide*, (1740,) 384, *&c.*

All the Acts of Assembly mentioned in the "case stated," except the Act of 1852, ch. 268, expressly reserve the rights of all persons; and it seems too clear for argument, that apart from such reservation, the rights of the grantors and their heirs, resulting from the terms of their deeds, could not be destroyed or diminished by the Acts of Assembly. The Legislature could neither enlarge the limited estate which the Society of Friends and their trustees had in the property, nor could it enable them to convey to others what they themselves had not.

Although more than twenty years may have elapsed since the time, (1860 or shortly thereafter,) when the land was diverted from the uses contemplated by the original deeds and Acts of Assembly, yet it may well be that the heirs of the grantors, (who, it appears, are unknown,) are or have been under disabilities, and therefore not barred yet from claiming the property.

The deed and lease to the appellant are for the use of a religious society, and do not express that the land was

"for a church, meeting or other house of worship," or "for a burying ground;" nor do they declare that the land should "be improved, enjoyed or used only for such purpose;" and it is not averred or shown that any assent of the Legislature has been given to the deed or lease. The deed and lease are therefore in contravention of the Declaration of Rights and void. *Grove vs. Trustees of Disciples,* 33 *Md.,* 451; *Church Extension Soc. vs. Smith,* 56 *Md.,* 362.

Not only is the title in this respect bad in its present *status,* but it is incapable of amendment so as to confer a marketable title. For if the title be corrected by confirmatory assurances from the grantors, the land would be limited to use "for a church, meeting or other house of worship" of the Universalist Society, or for a burying-ground for the same Society; in which case the title would come under the ruling of this Court in *Reed, et al. vs. Stouffer, et al.,* 56 *Md.,* 236.

And as the deed and lease were executed prior to the adoption of the Constitution of 1864, and the Constitution of 1851 required, by implication the *prior* assent of the Legislature, without which the conveyances were *"void,"* no subsequent Act under a new Constitution can give life to that which is legally dead. *Murphy vs. Dallam,* 1 *Bland,* 529; *State, use of Trustees, &c. vs. Warren,* 28 *Md.,* 354.

IRVING, J., delivered the opinion of the Court.

This is a special case stated wherein all the facts are agreed upon and filed instead of a regular bill for specific performance. The only question for determination is whether the appellant has a good title to the property which the appellee has agreed to buy as and for " a good marketable and sufficient" title. Upon the case stated that question was submitted to the Circuit Court of Baltimore City, with right to appeal reserved. The Circuit

Court decided the title was not "good and marketable," and decreed that the case stated should be dismissed. From that decree appeal was taken.

The real estate, which is the subject of controversy, is part of a tract of land which was conveyed in trust for the use of the Society of Christian people calling themselves Quakers, inhabiting and dwelling in and near the town and county of Baltimore. The appellant derives whatever title it has through two deeds conveying the property for the use already stated. One, which is described as Exhibit "F," is a deed from Andrew Stigar to John Cornthwait and Gerard Hopkins, dated the nineteenth day of June, seventeen hundred and seventy-three. The consideration is "thirty-five pounds and four shillings," and the conveyance is made to John Cornthwait and Gerard Hopkins, "their heirs, executors and administrators." The *habendum* clause is "unto the said John Cornthwait and Gerard Hopkins, their heirs, executors, administrators or assigns, for and to the use of and purpose following,—to say, for the use of the Society of Christian people called 'Quakers' inhabiting and dwelling in and near the Town and County of Baltimore in the Province aforesaid, to enclose and keep the same for a burying place to bury or inter those of the same society, that may from time to time depart this transitory life, and also to erect or build a meeting house for the same society of people, for the public worship of Almighty God, or such other improvements as they, the said society may think proper," &c. To this deed was added a covenant of the grantor that he was seized in fee and had right to convey, and of warranty against all persons.

The other deed marked "G," is from John Deaver to John Cornthwait and Gerard Hopkins and their heirs, executors and administrators, and is dated the twenty-first day of June, seventeen hundred and seventy-three. The consideration of this deed is eighteen pounds and eleven

shillings. The *habendum* clause of this deed is in the following language, "unto the said John Cornthwait and Gerard Hopkins, their heirs, executors, administrators, for and to the use of and purposes following, that is to say, for the use of the society of Christian people called Quakers, inhabiting and dwelling in and near the Town and County of Baltimore in the Province aforesaid, to enclose and keep the same for a burying place, to bury or inter those of the same society, that may from time to time depart this transitory life, and also to erect or build a meeting house for the same society for the public worship of Almighty God, and other business concerning the affairs of the said society of people called Quakers according to the custom and manner used and practiced by the said society and people called 'Quakers,' and to and for no other use, intent or purpose whatsoever," &c. To this is added a covenant that if the land is taken away "by due course of law," the grantor and his heirs will "make good all damages the said John Cornthwait and Gerard Hopkins, their heirs or the society, shall sustain by the recovery of the same aforesaid."

It appears that the title of John Deaver to the land conveyed by the immediately preceding deed was regarded as defective by reason of the non-recording of the deed to him, and on the ninth day of March, (1786) seventeen hundred and eighty-six, the heirs of Thomas Sligh, the grantor by deed marked "H," in the record, executed a deed of confirmation for the property to John Deaver, only son and heir-at-law of John Deaver, the grantor in deed marked "G," which deed of confirmation was "to John Deaver, his heirs forever, to the only proper use and behoof of the society of Christians known and distinguished by the title of Friends, and now in possession of said society, their successors and assigns forever." To this is added a covenant of warranty against all persons claiming under them.

By chapter 20 of the Acts of seventeen hundred and ninety-three, the Legislature referring to and reciting the provision of the Bill of Rights, that no religious society should hold more than *two* acres of ground without the leave of the Legislature, (and reciting the application of the Quaker Society for an Act, making it lawful for them to hold the property,) made it lawful for the Society to hold the lots hereinbefore described. But that Act, by its second section, saved "to all and every person their several and respective rights;" and by its third section described the uses to which the property was to be put, and to which the Legislature assented, and added, "and for no other use or purpose whatever."

Subsequently to this Act assenting to the holding of this property by the Quakers, Gerard Hopkins, the last mentioned John Deaver, son and heir of the first named John Deaver, and divers other persons united in a deed to Gerard T. Hopkins, Isaac Tyson, John Dukehart and John Trimble of Isaac, their heirs and assigns forever, of all that property for the uses and purposes therein mentioned. That deed was dated the fourth day of April, eighteen hundred, and the *habendum* clause was that all those persons named as trustees should hold the property "in trust for the use of the society of people called 'Quakers,' according to the tenor of the Act of the General Assembly of Maryland, passed at November Session in the year seventeen hundred and ninety-three, entitled 'an Act to confirm the title of certain lots of ground to the society of people called "Quakers" in Baltimore-town, whereon is their meeting house and burying ground,' and *for the uses and purposes in the said Act expressed and contained.*"

The Act of the General Assembly of 1852, chapter 268, after reciting in the preamble that John C. Turner, Isaac Tyson, Jr., William Riley, John Brown, and Joseph Matthews, held certain lands for the purpose of a burying

ground and meeting-house by the Society of Friends or Quakers, appointed agreeably to the provisions of the Act of 1821, and that certain portions of the land were unfit for the object intended, proceeds to authorize the sale of such portions or the lease thereof, and the application of the proceeds to the enclosure and improvement of the remainder, and the purchase of other burying grounds elsewhere. Under the supposed authority and protection of this Act, the trustees, on the 21st of June, 1855, leased the ground now involved to Charles W. Robach for ninety-nine years, renewable forever, reserving a yearly rent of one cent, with a covenant to convey the fee on request to him or his assigns. This lease Robach assigned to Jesse Marden, Ezra Whitman, and Edward W. Robinson, and their administrators or assigns, and on request of Robach the fee was conveyed to them, and from them by mesne conveyances, the appellants have acquired their title.

Now it is very clear that if these original deeds did not convey an indefeasible title, and that, in consequence of the diversion of the property from the uses to which it was conveyed, any *reverter* thereof would occur to the grantors and their heirs-at-law, then the Act of 1852 would not have the effect of divesting vested rights of individuals, and thus make the alienations pursuant to the Act of 1852 effectual in conferring a good and indefeasible title. The original conveyances, which have been recited, conveyed the property for certain specified uses of certain Christian people, and *for no other use whatever.* The Act of 1793, chapter 20, which assented to the holding and use by such Christian denomination, confirmed its assent to a holding for the uses named, and in express terms *saved all individual rights,* which would embrace the remaining rights of the grantors and their heirs, if they had any. A second Act of Assembly was passed for the benefit of the same Society and the same property, in

1812, being chapter 158 of that year's enactments. That Act seems, by its recitals, to have been made necessary by the death of some of the trustees, and was for the purpose of naming others and vesting in them the property. It does so "for the same uses and purposes as are mentioned" in the Act of 1793, chapter 20, "and for no other use or purpose whatsoever, *saving to all and every person their several and respective rights.*"

The same reasons which induced the passage of this Act of 1812, appear to have caused the passage of the Act of 1821, chapter 130, for the benefit of the same body of Christians and respecting the same property. This appears by the preamble thereof. It seems also to have been designed to settle some controversies respecting the extent of burial in the lot, and what parts were subject to that use. This Act, by its sixth section, makes this provision, "that nothing herein contained shall authorize or in any manner empower any of the aforesaid trustees or their successors, to will or dispose of any of the property vested in them by this Act." Thus it appears to have been the desire of both the deeds and the laws sanctioning the holding under them, to confine the holding, and the assent to the holding, to a holding for the expressed uses of burial and church purposes.

In *Reed, Howard, et al. vs. Stouffer, et al.*, 56 *Md.*, 253, this Court, in passing upon the rights of certain "German Baptists," called "Dunkers," to have certain property held in trust for them for a burying ground, under a deed from John Eager Howard, said: "By the express terms of the deed, it was the intention of the parties to it to dedicate the lot conveyed to the uses therein specially declared; and neither they, their heirs, the *cestuis que trust*, nor the lot holders, have any right to divert it from those uses. The fact that a valuable consideration was paid for the grant can make no difference. The estate conveyed and granted in express and exclusive terms,

cannot be enlarged by the amount of consideration paid. Where uses are declared, they are to be held correspondent to the consideration. *Fonblanque's Equity, Book* 11, *section* 4, notes and authorities there cited. And it certainly cannot be inferred, from the amount of consideration paid, that the grantor intended to convey an estate which the grantees were expressly prohibited by the 34th Article of the Declaration of Rights from taking; that Article declaring void all gifts and conveyances of land to religious societies, except not exceeding two acres on which to erect a building for Divine worship, or to be used as a place for the burial of the dead. It is manifest that neither the original trustees named in the deed of 1818, nor their heirs, nor the lot holders have any right to have the lot sold and the proceeds distributed among them or any of them. It must be held and ruled in strict conformity to the terms of the deed by which it was conveyed, and for the uses therein specially ordained. Should it be diverted from those uses, the terms of the deed under which alone it is now held, would be violated, and the heirs of General Howard would immediately become reinvested with title to the lot."

The appellee contends that this case of *Reed, Howard, et al. vs. Stouffer, et al.*, is. decisive of the question at issue here, and fully establishes that the appellant has no such title to the property proposed to be sold to the appellee, as a Court of equity will compel him to take. On the other hand, the appellant contends that there is an important element in this case which was wanting in the *Stouffer Case*, which makes a material distinction between the cases. In these deeds of 1773 and 1786, there are covenants of seizin and of warranty, which appellant contends operate "to negative" any "restriction which might be inferred from the uses set forth in the earlier portions. of the deeds." The language of the covenants of warranty include these words, "for himself and. his heirs and.

assigns doth covenant and grant to and with the said John Cornthwait and Gerard Hopkins, their heirs and assigns, and the Society of people called Quakers, that he, the said Andrew Stigar and his heirs will well and truly warrant and defend the same," etc. It is contended that the use of the word "grant" in the covenant gives it additional force, and operates to pass an estate in fee without restriction, and that the warranty effectually estops the heirs of the grantor from attempting any disseizin.

No rule is better settled than that contended for by appellant, that the intention is to be gathered from the expressions of the whole instrument; and that it is to be construed most beneficially for the grantee. But following it, we cannot draw the conclusions contended for by appellant. Guided by that rule, we find nothing in the deeds outside the *habendum* clause to justify the conclusion that any other or different estate was designed to be conveyed than that which is so expressly designated in the *habendum* of the deeds. The uses are clearly and distinctly set forth, and in one of them the words, "and for no other use whatsoever" are added; thereby expressly excluding the idea that a larger estate was intended to be granted. In addition it may be said, as was said in *Stouffer's Case, supra,* that it cannot be supposed an intention existed to grant what the *cestui que trust* could not take under the prohibition of the Declaration of Rights. The covenant is to be construed with reference to the estate and interest which is described as conveyed; and which the *habendum* clause limits; and the obligation to assure which is thereby enacted, can and should only be held to be an obligation to assure the precise estate granted in the deed, and nothing more. Being co-extensive with the estate granted, it ceases when that ceases. This was the view maintained in *Zittle vs. Weller,* 63 *Md.,* 190. No authority is there cited, but abundant authority exists.

In 2 *Coke Littleton*, 385*b*, it is said : "But a warrantie of itselfe cannot enlarge an estate ; as if the lessor by deed release to his lessee for life and warrant the land to the lessee and his heeres, yet doth not this enlarge his estate." The same statement of the law is made in 1 *Sheppard's Touchstone*, 182. In *Rawle on Covenants of Title*, page 415, it is said to be a *familiar principle that warranty* will not enlarge an estate. Warranty is a defence, and not a title. 1 *Shep. Touchstone*, 181–182; *Hurd vs. Cushing*, 7 *Pick.*, 169 ; *Adams vs. Ross*, 1 *Vroom*, 509, 510 ; *Register vs. Rowell*, 3 *Jones*, (*N. C.*,) 312.

The introduction of the word "grant" into the covenant cannot enlarge the operation of the covenant beyond that for which the covenant was introduced and was intended, viz., to assure the particular estate granted. It cannot make it a new granting clause. Many old forms use the word in that connection. In old Maryland forms it was very common. 1 *Harris' Entries*, 10, 42, 44, 45, 46. But in all such cases it is used in a covenanting sense only, and it was never held to make the covenant a granting clause. In all cases of plain conflict or inconsistency in the clauses of a deed, the first clause prevails. *Zittle vs. Weller*, 63 *Md.*, 190.

There having been a clear diversion of the property from the uses to which it was devoted by the original deeds, the rights of the heirs-at-law of the original grantors of the property, who from the great lapse of time may be supposed to be dead, to have the land again by *reverter*, have arisen, and cloud the title of the appellant. It does not appear that the heirs of Thomas Stigar or of John Deaver have failed, and that the reversion had escheated to the State, before the Act of 1852. It is true that the son of John Deaver, the original grantor in one deed, and his only heir-at-law, took title for the use of the Quakers by way of confirmation of their rights, but it was for the *same uses, and no other*, and the same dif-

ficulty arises over his possible heirs as exists with respect to the possible heirs of Stigar.

Notwithstanding the long possession of the appellant, without molestation, it does not appear by the admissions in the case to have been such a possession as could be relied on against the possible heirs of those grantors; for infancy, coverture, and other disabilities *may have* existed to protect them.

Entertaining the views we have expressed with respect to the effect of the original deeds and the results of the diversion of the property from the uses for which it was granted, we have not thought it necessary to consider how the title of the appellants would stand under Exhibits " C " and " D," in view of the provision of the Declaration of Rights. In any event, their title is dependent on the title of the Quakers, and as we decide as to that title, that there may be heirs of the original grantors to assert rights adverse to them, which would have to be respected, which cloud the title, further consideration of appellants' title is unnecessary. Nor have we found it necessary to decide whether any of the Acts of Assembly, with reference to the Quakers, have had the effect to make them a corporation; for, if such effect had resulted from any of the Acts, their powers to use the property otherwise than as granted would not have been thereby increased, and diversion from the use created would still leave the reversionary rights, in consequence thereof, unaffected.

It is the established rule in equity that a purchaser will not be compelled to take a title which is not free from reasonable doubt, and which might in reasonable probability expose him to the hazards of litigation, therefore the decree must be affirmed.

*Decree affirmed.*

(Decided 23rd June, 1886.)