MAYOR AND CITY COUNCIL OF OCEAN CITY, MARYLAND *v.* THOMAS T. TABER, JR. ET. AL.

[No. 95, September Term, 1976.]

*Decided January 6, 1977.*

116

The cause was argued before MURPHY, C. J., and SINGLEY, SMITH, DIGGES, LEVINE, ELDRIDGE and ORTH, JJ.

*Dale R. Cathell* for appellant.

*Fulton P. Jeffers,* with whom were *Hearne & Bailey, P.A.* on the brief, for appellees.

ORTH, J., delivered the opinion of the Court.

This appeal concerns the ownership of an improved lot of ground at the northwest corner of Atlantic Avenue and Caroline Street in Ocean City, Maryland, which was occupied and used by the United States of America as a Life Saving Station for almost a hundred years. At the hub of the controversy is whether the United States acquired title in fee simple absolute through adverse possession or lost all its right, title, interest and estate in the property by realization of a possibility of reverter.

I

The relevant record title to the property devolves through three conveyances: 1) a deed dated 28 July 1876 from Stephen Taber and wife to Hillary R. Pitts, Benjamin Jones Taylor and George W. Purnell, Trustees (the Trustees), recorded among the Land Records of Worcester County in

Liber I.T.M. No. 4, folios 536-537 (the 1876 deed); 2) a deed dated 11 September 1878 from the Trustees to the United States of America, recorded among the aforesaid Land Records in Liber I.T.M. No. 6, folios 400-402 (the 1878 deed); 3) a deed dated 23 June 1967 from the United States of America to the Mayor and City Council of Ocean City, recorded among the aforesaid Land Records in Liber F.W.H. No. 220, folios 449-451 (the 1967 deed). Involved in the controversy is a decretal order of the Circuit Court of Worcester County issued 18 August 1894 in equity action No. 1399, instituted on 27 August 1892, the proceedings of which are recorded in Chancery Record Liber F.H.P. No. 18, folios 404-445 and 550-553 (the 1892 chancery action).

## II

On 15 January 1869 Stephen Taber and Hepburn S. Benson obtained a patent from the State of Maryland. The patent, preserved in the Hall of Records in Liber W. L. & W. S. No. 2, folios 326-327, gave Taber and Benson "The Lady's Resort to the Ocean", a 280 acre tract of land along the Atlantic Ocean in Worcester County. Taber acquired Benson's interest by deed dated 9 October 1871 and recorded among the aforesaid Land Records in Liber I.T.M. No. 1, folios 591-592.

Stephen Taber created Ocean City, "desirous," as he explained in the 1876 deed, "of conforming to the views and general public sentiment of the people of Worcester and the adjacent counties in their desire to establish a place as a sea-side Summer Resort and the promotion of the growth of the same." Fifty acres of "The Lady's Resort to the Sea", with his acquiescence and approval, were "laid off into a town, with lots, streets and avenues, as is called and known as Ocean City", and he granted the fifty acres to the Trustees by the deed of 1876, appending a plat of the proposed town.[1] The terms of the trust were set out in the habendum clause. The Trustees were to hold the property

---

1. The conveyance excepted and reserved from the fifty acres "so much thereof as has been by deed bearing even date herewith, conveyed to the Atlantic Hotel Company of Berlin, and also so much thereof as has been by deed bearing even date herewith granted to Wicomico and Pocomoke Rail

"upon trust, that they or their successors shall convey the same, with as little delay as practicable, at the expense of the grantee or grantees named in the deeds in lots as they are described on said plat and according to their numbers; to such persons as draw the same at a distribution of said lots, made by the Stockholders of the Atlantic Hotel Company at the Atlantic Hotel at Ocean City on the thirty first day of August Eighteen Hundred and Seventy Five. And if there are any lots remaining which are not drawn at the aforesaid distribution, then and in that event, the said trustees or their successors are hereby authorized and empowered to sell and convey the same to such persons as they think proper or to make any other disposition of said lots they think proper and appropriate the proceeds thereof in such manner as they shall deem most advantageous to the interest of said Ocean City."

Lot no. 3, as laid out on the plat, was at the northwest corner of Atlantic Avenue and Caroline Street. Its exact size is not shown, for the plat reflects neither lot dimensions nor a scale. It was, however, much larger than the size of the other lots except that of the Atlantic Hotel. It was bounded by the west side of Atlantic Avenue on the east, the north side of Caroline Street on the south and the east side of Baltimore Avenue on the west and was of irregular width.

The deed of 1878 conveyed a part of lot no. 3 to the United States of America. The part conveyed was described as "beginning at the northwest corner of Atlantic Avenue and Caroline Street thence running westerly by and with the north side of Caroline Street one hundred feet thence northerly by a line parallel with Atlantic Avenue fifty feet then easterly by a line parallel to Caroline Street one hundred feet to Atlantic Avenue, thence by and with the west

Road Company, together with the right of said Rail Road Company to occupy not to exceed sixteen feet in width for the construction, maintenance and operation of a rail road through and along Baltimore Avenue its entire length." The grant was also subject to streets and avenues (except Caroline Street) as laid down on the plat. There were 205 lots laid out between Atlantic Avenue on the east, Synepuxent Bay on the west, past Caroline Street on the north and to Division Street on the south.

side of Atlantic Avenue fifty feet to the place of beginning, all in Ocean City, County of Worcester and State of Maryland." The deed declared that lot no. 3 had not been drawn in the distribution and that a part thereof had been sold to the United States by the Trustees for the sum of one dollar. The deed recited that the Secretary of the Treasury of the United States had been authorized by Act of Congress of 3 March 1875 "wherever he shall deem it advisable, to acquire by donation or purchase, in behalf of the United States the right to use and occupy, sites for Life Saving, or Life Boat Stations. . ." and that the Secretary of the Treasury deemed "it advisable to acquire on behalf of the United States the right to use and occupy, the hereinafter described lot of land, as a site for a Life Saving Station, as is indicated by his signature hereto. . . ." The part of lot no. 3 granted by the deed was "for the purpose of a Life Saving Station, and also the right to erect such structures, upon the said land, as the United States may see fit, and to remove any and all such structures and appliances at any time, the said premises to be used and occupied, for the purpose named in said act of March 3, 1875. . . ." The habendum clause read:

> "to have and to hold the said lot of land and privileges, unto the United States from this date for the purpose aforesaid. And it is further stipulated, that when the United States shall fail to use the said Life Saving Station, the land hereby conveyed for the purpose aforesaid, shall, without any legal proceedings, suit or otherwise, revert to the said Trustees, their successors and assigns, absolutely, and they shall be entitled to re-enter upon and take possession thereof free from all encumbrances of every nature or kind."

The deed was signed and acknowledged by the Trustees and signed by the Secretary of the Treasury.

The 1967 deed was designated a "Quitclaim Deed." The United States of America was "Grantor", and the Mayor and City Council of Ocean City, Maryland, was "Grantee." It

witnessed that "the Grantor has remised, released and forever quitclaimed, and by these presents does remise, release and forever quitclaim any and all right, title and interest which [the United States] may have, on an 'as is, where is' basis" to two parcels of land and designated improvements thereon. The first parcel described was the lot conveyed by the 1878 deed.[2] The habendum clause read: "TO HAVE AND TO HOLD the premises herein granted unto the Grantee, its successors and assigns forever." The deed expressly declared that it was "executed and delivered to the Grantee without representations, warranties or covenants, either express or implied."

## III

On 17 July 1973 an equity action for a declaratory judgment was instituted in the Circuit Court for Worcester County by Thomas T. Taber, Jr., et alii (appellees) against the Mayor and City Council of Ocean City (appellant), et alii. Motions for Summary Judgment filed by appellees and by appellant were determined without hearing or argument by agreement. The motions were denied on 4 December 1975 with the suggestion that the parties "submit the entire proceeding to the Court upon the pleadings and exhibits in the file." The suggestion was followed. On 17 December all parties, through their counsel, requested that the court "render an Opinion and Order based upon the pleadings and exhibits presently on file herein, after giving due consideration to the memoranda of the various parties filed herein, and render its decision hereon at its earliest convenience without a hearing or taking of testimony on this

---

2. The description of the first parcel in the 1967 deed is the same as the description in the 1878 deed except that the beginning point in the 1967 deed is given as "the northeast corner of Atlantic Avenue and Caroline Street." This is an obvious error, probably arising in the deciphering of the handwriting in the 1878 deed.

The second parcel as described in the 1967 deed was a lot fifty feet wide and one hundred feet deep immediately adjoining the rear of the first parcel. The deed did not contain a "being" clause, and the source of the title to the second parcel was not disclosed therein and does not appear in the record before us. It follows that the resolution of the case *sub judice* does not affect this second parcel.

matter." The court honored the request, and its order came
forth on 8 April 1976. Only the Mayor and City Council of
Ocean City noted an appeal therefrom to the Court of
Special Appeals. We granted a writ of certiorari before
decision by that Court.[3]

## IV

Appellant would have the 1878 deed be ineffective. Thus,
it reasons, the United States, and appellant through privity
of estate, *Gore v. Hall,* 206 Md. 485, 491, 112 A. 2d 675 (1955),
would have acquired legal title to the property by adverse
possession. *Wilt v. Wilt,* 242 Md. 129, 135, 218 A. 2d 180
(1966); *Hungerford v. Hungerford,* 234 Md. 338, 340, 199 A.
2d 209 (1964); *Bishop v. Stackus,* 206 Md. 493, 498, 112 A. 2d
472 (1955); *Ridgely v. Lewis,* 204 Md. 563, 566, 105 A. 2d 212
(1954); *Columbia Bldg. Co. v. Cemetery,* 155 Md. 221,
225-226, 141 A. 525 (1928); *Novak Realty Co. v. Orphans'
Home,* 153 Md. 390, 393, 138 A. 250 (1927); *Peper v. Traeger,*
152 Md. 174, 181, 136 A. 537 (1927); *Mayfield v. Safe Dep. &
Tr. Co.,* 150 Md. 157, 161-162, 132 A. 595 (1926); *Balto. Life
Ins. Co. v. M. E. Church,* 148 Md. 603, 608-609, 129 A. 908
(1925); *Singer v. Wyman Memorial Assn.,* 138 Md. 398,
409-410, 114 A. 50 (1921); *Amer. Colonization Society's Case,*
129 Md. 605, 99 A. 944 (1917); *Novak v. Orphans' Home, Etc.,*
123 Md. 161, 167-168, 90 A. 997 (1914); *Mills v. Zion Chapel,*
119 Md. 510, 87 A. 257 (1913); *Dickerson v. Kirk,* 105 Md. 638,
639-640, 66 A. 494 (1907); *Regents v. Calvary Church,* 104
Md. 635, 638-642, 65 A. 398 (1906); *Zion Church v. Hilken,* 84
Md. 170, 171-172, 35 A. 9 (1896); *Gump v. Sibley,* 79 Md. 165,
169, 28 A. 977 (1894); *Needles v. Martin,* 33 Md. 609, 619
(1871).

The 1878 deed, on its face, was a valid conveyance by the

---

**3.** The facts as set out *supra* are not disputed in material part and are as
found by the trial court from the pleadings and exhibits. Appellees asserted
that they could not accept the Statement of Fact set out in appellant's brief
"as it is argumentative and contains legal conclusions not established
below." In making the Statement of the Case in its brief, appellant said:
"Stipulations and agreements as to facts were filed by the parties. . . ." No
such stipulations and agreements appear in the Joint Record Extract nor
are they included in the record transmitted to us.

Trustees to the United States of an estate in fee simple determinable of a part of lot no. 3. It would be ineffective only if the Trustees had no power to make the conveyance. The Trustees derived such power from the 1876 deed. Appellant points to the 1892 chancery action as holding that the provision in the 1876 deed authorizing the Trustees to sell lots not drawn at the distribution was "utterly null and void to all intents and purposes whatever, and that the said part of said deed [of 1876] shall not interfere with nor in any manner affect the right, title and claim of [certain named] devisees of Stephen Taber, deceased. . . ." Appellant claims that, therefore, the 1878 deed passed no legal title, and as the United States entered into possession of the·property under color of the 1878 deed, its possession from the time of the entry was actual, notorious, exclusive, hostile and under claim of title and ownership. As it retained such possession continuously for more than twenty years, it acquired a valid estate in fee simple absolute.

The chancellor in the case *sub judice* declared that the 1892 chancery action did not void the 1878 deed and that, therefore, appellant did "not acquire title to the property in question by virtue of adverse possession thereof." We think he was right.

The parties to the 1892 chancery action were certain heirs and devisees of Stephen Taber and the then Trustees under the deed of 1876. Although a part of lot no. 3 had been conveyed by the Trustees to the United States about fourteen years before, the United States was not a party to the action. The Bill of Complaint listed sixty-four lots by number as designated on the plat made part of the 1876 deed. These lots had not been drawn at the distribution called for in that deed, a ɩd had not been sold or disposed of by the Trustees. Lot no. 3 was not among them. The Bill prayed that the deed of 1876, "so far as the same purports to affect the title to the aforesaid lots at Ocean City, in Worcester County, Maryland, still remaining in the possession of the said Trustees, or their successors, and which were not drawn at the aforesaid distribution, may be vacated and annulled; and that the said lots may be

sold. . . ." On 18 August 1894 the chancellor decreed that the part of the 1876 deed which prescribed the disposition of lots not drawn at the distribution was "set aside and declared to be held and taken to be utterly null and void to all intents and purposes whatever, and that said part of said deed . . . shall not interfere with nor in any manner affect the right, title and claim of [named devisees of Stephen Taber] in and to all of said lots in said deed . . . which were not drawn at the said distribution referred to in said last named deed [of 1876] — the said lots not drawn as foresaid being described by number as follows: . . . ." Sixty-six lots were so described.[4] Lot no. 3 was not among them. It was ordered that the said described lots be sold and two Trustees were appointed to sell them.

The decree was preceded by an opinion filed 25 May 1894. The chancellor said:

> "The proceedings show that quite *a number of lots remained after the drawing & are now in the hands of the Trustees unsold.* The representatives of the grantors in the original deed of trust, claim the trust is void *as to these lots* and have filed their bill, to obtain a sale and a division of the proceeds among them. The grounds upon which they insisted that as to *these unsold lots* the trust is void are two . . . .

> \* \* \* ·

> Without assigning the reasons (which are so well stated in the arguments of Counsel), I am of the opinion that both of these grounds are well taken; & that therefore, *so far as the lots now remaining unsold are concerned,* the trust is void, and the title still remains in the devisees of the grantor and

---

4. The sixty-four lots listed in the Bill of Complaint did not include lots nos. 134, 147 and 192 which were included in the sixty-six lots listed in the decree. Lot no. 122 was included in the Bill of Complaint but was not among those listed in the decree.

their grantees. I will therefore sign a proper decree for *the sale of the lots as prayed for in the bill."* (emphasis added)

We find it manifest that the 1892 chancery action did not affect the title of that part of lot no. 3 conveyed to the United States. Lot no. 3 had been conveyed to the United States by the Trustees some fourteen years before the equity action was instituted. The United States was not a party to the action. The action did not seek relief with respect to lot no. 3, it not being among those listed in the Bill of Complaint. The decree afforded no relief with respect to lot no. 3, it not being among those listed therein to be sold. In short, the purpose of the action, as was patent from the pleadings, was to obtain the sale of those lots then in the possession of the Trustees, not those lots which had previously been conveyed. The intendment and effect of the decree, as is obvious from the opinion of the court and the decree itself, was no more than that. We find, as did the chancellor below, that the decree in the 1892 chancery action in nowise affected the title to property obtained by the United States under the 1878 deed.

On appeal appellant urges that the 1876 deed was void without regard to the 1892 chancery action because its trust provisions were uncertain and void and it was without a beneficiary in existence at the time of the creation of the trust. It suggests that its being void does not depend upon a court declaration. The trouble with this view is that the point does not plainly appear by the record to have been tried and decided by the lower court. Maryland Rule 885. In fact, we do not find in the joint record extract that the point was ever presented to the lower court, despite the indication by appellant that it was. Appellant's Answer to the Bill of Complaint, its Answer in Opposition to appellees' Motion for a Summary Judgment, its own Motion for a Summary Judgment, its several memoranda of law submitted to the lower court, all spoke of the 1876 deed as being void only in relation to the 1892 chancery action. It is apparent that the chancellor did not consider that the point now presented was before him, because he did not mention it in his opinion or

decide it in his decree, as would have been necessary, in the circumstances, had it been properly raised below.

As the question whether the 1876 deed was void or some provisions of it were ineffective without regard to the 1892 chancery action was not raised below and was not specifically decided by the trial court, it was not preserved for appellate review. *Thomas v. Corso*, 265 Md. 84, 108, 288 A. 2d 379 (1972); *Adams v. Wilson*, 264 Md. 1, 11, 284 A. 2d 434 (1971); *Broadfording Ch. v. Western Md. Ry.*, 262 Md. 84, 89, 277 A. 2d 276 (1971). The result is that within the ambit of the case *sub judice*, the 1876 deed stands valid, and the 1878 deed is fully effective.

As the 1892 chancery proceeding did not affect the 1876 deed, appellant's attempted application of the doctrine of *res judicata* to have that deed be void under the 1894 decree is fruitless.

Appellant says that appellees alleged in their Bill of Complaint that the 1876 deed was utterly null and void and that appellant in its Answer admitted the allegation. It follows, therefore, appellant claims, that the allegation is conclusive against appellees, citing *Matthews v. Kernewood, Inc.* 184 Md. 297, 40 A. 2d 522 (1945), and other cases. Appellant points to paragraph 9 of the Bill of Complaint which read:

> "That the plaintiffs aver that by the said decree of Court dated August 18, 1894, that portion of the deed from Stephen Taber and wife to the said Trustees, dated July 28, 1876, which authorized the Trustees to sell and convey the lots remaining which were not drawn, was determined to be utterly null and void to all intents and purposes whatever, and that part of the said deed hereinbefore set forth shall not interfere with nor in any manner affect the right, title and claim of the heirs of Stephen Taber, being the plaintiffs herein, to whom the title of said property has passed by intestate succession or devise to the said present heirs of Stephen Taber."

Paragraph 9 of appellant's Answer admitted that the 1894 decree so declared and went on to allege that the decree made the 1878 deed "an ineffective instrument for the purposes of conveying titles. . . ." We find it obvious from the Bill of Complaint as a whole, that paragraph 9 thereof was merely a statement of what the 1894 decree held, and not a concession that it applied to render the 1878 deed ineffective. The relief sought depended upon the property reverting upon the occurrence of the event specified in the 1878 deed, a position relying upon the validity of that deed.

We have decided that, as the validity of the 1878 deed was not affected by the 1892 chancery action, and as there is no other question regarding its validity properly before us, the 1878 deed stands valid. Therefore, the legal owner of the property described in the deed is to be determined under it.

The 1878 deed conveyed an estate in fee simple determinable. Such an estate has been long recognized in Maryland. *Second Universalist Soc. v. Dugan*, 65 Md. 460, 5 A. 415 (1886); *Kelso v. Stigar*, 75 Md. 376, 24 A. 18 (1892); *Brown v. Hobbs*, 132 Md. 559, 104 A. 283 (1918). The estate is discussed in 1 H. T. Tiffany, *The Law of Real Property* § 220 (3rd ed. B. Jones 1939):

> "An estate in fee simple determinable, sometimes referred to as a base or a qualified fee, is created by any limitation which, in an otherwise effective conveyance of land, creates an estate in fee simple and provides that the estate shall automatically expire upon the occurrence of a stated event.

> \* \* \*

> No set formula is necessary for the creation of the limitation, any words expressive of the grantor's intent that the estate shall terminate on the occurrence of the event being sufficient. . . . So, when land is granted for certain purposes, as for a schoolhouse, a church, a public building, or the like, and it is evidently the grantor's intention that it shall be used for such purpose only, and that, on the

cessation of such use, the estate shall end, without any re-entry by the grantor, an estate of the kind now under consideration is created.

* * *

If one who has an estate in fee simple creates a determinable fee in favor of another, he has thereafter merely a possibility of re-acquiring the land by reason of the occurrence of the contingency named or indicated, this possibility being known as a possibility of reverter."

See *Restatement of Property* § 44 (1936). We described a possibility of reverter in *Ringgold v. Carvel*, 196 Md. 262, 272, 76 A. 2d 327 (1950):

"A possibility of reverter is any reversionary interest which is subject to a condition precedent. . . . When the owner of an estate in fee simple absolute transfers an estate in fee simple determinable, the transferor has a possibility of reverter. In other words, if one who has an estate in fee simple creates a determinable fee in another, he has thereafter merely a possibility of reobtaining the land by reason of the occurrence of the indicated contingency. Thus, where land is devised for a certain purpose, and it is the testator's intention that it shall be used for that purpose only, and that on the cessation of such use, the estate shall end without re-entry by the grantor, a possibility of reverter arises. . . . In case of a diversion of the land from the purpose for which it was devised, the heirs of the testator may be entitled to have the land again by reverter." [5]

---

5. A reversion, on the other hand, is ". . . any reversionary interest which is not subject to a condition precedent. . . . It is the residue of an estate left in the testator to commence in possession after the determination of some particular estate devised by him. Hence, a reversion arises whenever the

*See Evans v. Safe Deposit & Trust Co.,* 190 Md. 332, 345, 58 A. 2d 649 (1948); *Reed v. Stouffer,* 56 Md. 236, 253-255 (1881).

What the United States acquired in the property was a determinable fee and nothing more. Of course, the United States had the power to convey what it owned. "The owner of a determinable fee has all the rights of an owner in fee simple . . . ; conveyance of the property does not necessarily terminate the fee, but the grantee takes it subject to the same liability to termination as existed before the grant." 1 H. T. Tiffany, *The Law of Real Property,* § 220 (3rd ed. B. Jones 1939). Thus, having validly acquired a determinable fee, the United States could convey it. This it did by the 1967 deed, which remised, released and forever quitclaimed any and all right, title and interest which it had and on an "as is, where is" basis. The United States expressly made no warranties or covenants with reference to the property. The most that appellant acquired from the United States as to the first parcel described in the 1967 deed was a determinable fee, subject to the liability to termination set out in the 1878 deed. The trial judge "specifically" found that the 1967 deed established "the fact that the United States of America, as of that date, did 'fail to use the said Life Saving Station'." This finding was not clearly erroneous. Maryland Rule 886. It is ironic that evidence of the occurrence of the event terminating the estate was supplied by delivery of the 1967 deed conveying the determinable fee. The estate in fee simple determinable having terminated, the property reverted, and appellant was left with no right, title, interest or estate whatsoever.

There are statutory limitations on the duration of possibilities of reverter and rights of entry existing before 1 July 1969, but the statutes prescribe procedures to preserve the possibility and the right. Maryland Code (1957, 1973

---

owner of real estate devises or conveys an interest in it less than his own. The logical conception of it in the common law is that it is a return by operation of law to the owner of a portion of that which he owned before and in reality had never lost." Ringgold v. Carvel, 196 Md. 262, 272, 76 A. 2d 327 (1950).

Repl. Vol.) Art. 21, § 6-102. There are also statutory limitations on the period within which actions may be brought and land recovered by reason of termination of determinable fee simple estates occurring prior to 1 July 1969. Art. 21, § 6-103.[6] The action here was not barred by § 6-103, and the appellees in their Bill of Complaint alleged that the statutory requirements to preserve the possibility of reverter in the 1878 deed as required by § 6-102 had been met by the timely recording of a notice of intention to preserve the possibility of reverter. Appellant admitted the allegation in its answer. Maryland Rule 372 a 2. Thus, there is no issue raised with respect to the possibility of reverter and right of re-entry being barred by limitations.

Appellant's last three contentions concern adverse possession predicated upon the 1876 deed being void and the 1878 deed being ineffective. As we have found that both stood valid as far as the subject property was concerned, the possession of the United States was not hostile to the true owner, and it occupied the property, not under color of title, but under good legal title. See Gore v. Hall, supra, 206 Md. at 490-491; Hines v. Symington, 137 Md. 441, 444-445, 112 A. 814 (1921). Thus, the doctrine of adverse possession as urged by appellant is not applicable.

We note that, as the 1878 deed was in full force and effect, the statutory period for adverse possession would not start to run until 23 June 1967, the date of the occurrence of the event terminating the estate of fee simple determinable as found by the trial judge. Code (1957, 1973 Repl. Vol.) Art. 21, § 6-103 (now Real Property Art. § 6-103) provides:

> "Possession of land . . . after termination of an estate of fee simple determinable shall be deemed adverse and hostile . . . from the occurrence of the event terminating an estate of fee simple determinable."

**6.** Art. 21 was repealed by Acts 1974, ch. 12, § 1, effective 1 July 1974. The former provisions of §§ 6-102 and 6-103 now appear in Real Property Art. §§ 6-102 and 6-103 with only stylistic changes.

The trial judge correctly found that appellant had not acquired title by virtue of adverse possession.

Appellant asks if the appellees are "estopped from asserting a claim to the premises under the theories of estoppel, waiver or laches?" In the circumstances, it is patent that they are not. The 1878 deed divided the fee simple absolute estate in the property into the fee simple determinable estate conveyed by the Trustees and a possibility of reverter which remained in the hands of the Trustees. As we have observed, when the United States stopped using the property for a Life Saving Station, there was a diversion of the land from the purpose for which it was conveyed, the estate held by the United States was determined, and automatically a fee simple absolute estate was reestablished in those entitled under the original grantors. *Seloff v. Naidetsch*, 136 Md. 651, 655, 110 A. 896 (1920). It was not necessary for appellees to assert a claim to the fee simple absolute estate or to take any other positive action. They acquired a fee simple absolute estate by the realization of the possibility of reverter.

## V

The trial judge also determined who held the property in fee simple absolute upon its reversion and in what proportions. The propriety of that determination is not before us. Appellant asserts that it does not challenge the trial judge's designation of those who are entitled to the property and their respective shares because, if it prevails, the matter is moot, and if it is found not to be the owner of the property, it has no interest in who are entitled thereto.

## VI

We have indicated that the 1967 deed conveyed two parcels of land. The first parcel is that described in the 1878 deed. The source of the title of the United States in the second parcel, immediately adjoining the rear of the first parcel, is not disclosed in the record before us. We point out

again, see note 2, *supra*, that our holding here goes only to the first parcel and does not determine any rights with respect to the second parcel.[7]

*Judgment affirmed; costs to be
paid by appellant.*

---

**7.** In a trial memorandum submitted by appellees and included in the joint record extract, it is averred that by ordinance dated 3 December 1968 appellant enacted legislation to condemn "the land which is the subject matter hereof." Pursuant to the ordinance, appellant instituted a condemnation action in the Circuit Court for Worcester County. We do not know whether this action covered both parcels of land. The outcome of the action is not disclosed in the record before us.