## W. G. WOOLF et al v. D. Willard MADISON et ux

5-5481                                    464 S. W. 2d 74

### Opinion delivered March 8, 1971

*Lee Ward,* for appellants.

*Gus R. Camp,* for appellees.

LYLE BROWN, Justice. The appellants are the widow and nine of the ten children of Edgar Woolf, who died intestate in 1949. The appellees are the tenth child, Martha Madison, and her husband, Willard Madison. Appellants brought this action to cancel a deed to the Edgar Woolf homeplace wherein appellees were the grantees. Appellants asserted that one of the considerations for the deed was the agreement by appellees to care for the mother for the remainder of her life. Appellants contended the responsibility was violated. The chancellor held that appellants did not meet the burden of proof necessary to support their allegations. The appellants here contend that the findings of the chancellor "were against the clear preponderance of the evidence."

The Woolf homestead, the subject of this litigation, consisted of 131.5 acres in Clay County. It was not held

as an estate by the entirety. Shortly after the death of Edgar Woolf the widow and nine of the children deeded the lands to the tenth child, Willard Woolf. The deed recited a consideration of one dollar "and other good and valuable consideration." It reserved to the widow the main dwelling "for her sole use during the term of her natural life." On the same date Willard executed a note and mortgage in favor of the widow for $7,000, payable in annual installments of $500. In addition to the recited considerations there was an oral agreement between grantors and grantee that the latter would care for the mother during the remainder of her life.

Willard lived on the property and cared for his mother for about two years. He did not make any of the annual note payments. Willard wanted to leave the farm to attend college. With the consent of his mother he deeded the lands to a sister and her husband, Mr. and Mrs. Lloyd Kendrick. The Kendricks executed a note and mortgage to the mother for $10,000, payable in annual installments of $500. The use of the home by the mother was reserved in the deed. The Kendricks testified that they accepted the deed with the same verbal agreement to care for the mother.

The Kendricks decided, after three years, that the farming operation was not profitable. They arranged with appellees to take the land and assume the mortgage. That deed also reserved to the mother the exclusive use of the main house on the farm. Kendrick testified that he discussed with appellees the understanding among all the children that the grantees would be obligated to care for the mother.

In their answer, and in their brief, appellees contend there was no agreement on their part to care for the mother. Although the evidence does not reflect precisely the items of responsibilities contained in the obligations, we think the evidence is clear, cogent, and convincing that the ownership of the lands carried with it the condition that the owners did have limited obligations of care.

Willard Woolf was the grantee in the first deed we have described. He said one of the considerations for the deed, which he made with all the other children, was that he would care for the mother during her natural life. The second grantees were Mr. and Mrs. Lloyd Kendrick. Mrs. Kendrick testified that the care of her mother was very much a part of the consideration, excepting the payment for clothing and doctor bills. "And we were to get her to and from the doctor." The Kendricks testified that appellees agreed to the same arrangements. W. G. Woolf, another son, stated that appellees accepted the obligation to care for the mother. Of still greater significance on this point is the testimony of appellees. Martha Madison, one of the appellees, testified that she and her husband assumed substantially the same obligation toward the mother as did the Kendricks. Appellee Willard Madison testified that he made an agreement with Willard Woolf, ". . . the agreement we had we were to move out there in the house with her. She was going to buy her part of the groceries and we were to live there and see that she got to the doctor." (Mrs. Woolf, because of infirmities, did not attend court.)

The second pivotal question is whether appellees violated in substantial respect the obligations to the mother. We think those responsibilities were those described by the Kendricks and corroborated by appellee Martha Madison. The evidence preponderately shows that appellees abided by the agreement for some fifteen years and until Mrs. Woolf voluntarily left the home.

The Madisons, appellees, received their deed in May 1955 and shortly moved into the main house with the approval of the mother. At that time the mother was near sixty-five years of age and suffering from diabetes. That of course affected her diet. She administered her own insulin. From the outset and until Mrs. Woolf left the home in 1969 (near the age of eighty years) there is no question but that she received dutiful and kindly attention from appellee Martha Madison and her children. They took the mother to church regularly; they took her to the beauty shop weekly; she went with her daughter grocery shopping; she had her own television which the

family provided her; she had two rooms for her private use; she had access to a telephone; the daughters and appellee Martha saw that the mother's rooms were kept clean; and foods commensurate with her diet were supplied. Appellees' small son slept on a rug at his grandmother's bedside, which pleased her very much. The girls wrote letters, read to her, and ran errands for the grandmother.

According to appellees and two of their daughters, Mrs. Woolf became somewhat of a problem to the household. This appears to have set in about the time she passed her seventy-fifth year. She experienced two cataract operations, she became forgetful, and she gradually lost considerable strength. It was said that she became somewhat quarrelsome and exhibited an attitude of independence. Appellee Willard Madison said that on more than one occasion she would visit some of her other children and would leave after quarreling with them; and he said "any time she said anything to me it was criticism." Mrs. Madison said she avoided arguments with her mother by not contradicting her. One of the children testified that her grandmother "got a little childish," became more forgetful, and became a little more demanding; and that she developed a carelessness about her appearance and cleanliness. Another daughter testified that as her grandmother advanced in years she became more difficult to please; that she admonished the child about correcting her younger brother and sister; and that the grandmother became inquisitive about telephone calls received by other members of the family. Notwithstanding, there is no evidence that Mrs. Woolf's daughter, Martha, or the children treated Mrs. Woolf with anything but respect and understanding.

Appellee Willard Madison seems to have responded differently to the increasing idiosyncrasies of Mrs. Woolf. He said he moved his family into the main house at the suggestion of Willard Woolf, who felt that the Madisons could better "care for and look after Mrs. Woolf." Madison said his relations with Mrs. Woolf were very good for a number of years. His first displeasure with the Woolf family was that "they would come too often and

stay too long," Madison related. He denied emphatically that he set out to "freeze Mrs. Woolf out of the home." He admitted that he had not carried on any conversations with Mrs. Woolf for some few years "because any time she said anything to me it was some criticism. I didn't do something right." He also admitted that he had criticized Mrs. Woolf's demeanor—not to her—but to one or more of her children.

Several of Mrs. Woolf's children testified, in substance, that they noticed a strained relationship between Mrs. Woolf and appellee Madison; and that they were not on speaking terms. "If mama said something, he didn't like it and mama didn't like what he'd say every time." However, it can be said to the credit of appellee Madison that there is no specific evidence that he ever abused Mrs. Woolf, either physically or by spoken words. Mrs. Madison said she had never heard her husband use a profane word in the hearing of Mrs. Woolf.

When Mrs. Woolf left the home in 1969 she did not intimate that she had no intention of returning. She left the impression that she was going to visit her daughter, Ruth Kendrick. Mrs. Woolf asked Mrs. Madison to call Ruth to come after her. She took only some of her personal effects.

By virtue of the reservation of the homeplace in the deed, together with the oral agreement, Mrs. Woolf is entitled to live in the home with the Madisons, and if she returns, appellees are obligated to care for Mrs. Woolf and to see that she gets to the doctor. Appellees are not obligated to pay Mrs. Woolf's medical bills or to furnish her clothing.

Affirmed.