542 A.2d 387

QUEEN ANNE'S COUNTY ASSOCIATION FOR
HANDICAPPED CITIZENS, INC.

v.

Roland C. RINGGOLD.

No. 1483, Sept. Term, 1987.

Court of Special Appeals of Maryland.

June 10, 1988.

Certiorari Granted Sept. 2, 1988.

J. Donald Braden (Michael R. Foster and Foster & Braden, on the brief), Stevensville, for appellant.

John T. Szymkowicz (Aragona & Szymkowicz, on the brief), Oxon Hill, for appellee.

Argued Before BISHOP, ALPERT and ROSALYN B. BELL, JJ.

BISHOP, Judge.

The issue in this case is whether one act of negligence by a care-taker grantee, after seven years of excellent care, should cause a reversion of fee simple property to the grantor.

Queen Anne's County Association for Handicapped Citizens, Inc. (the Association), appeals from an Order of the Circuit Court for Queen Anne's County by which property which is the subject of this proceeding reverted to appellee

Roland C. Ringgold (Ringgold) and denied the Association's claim for setoff. The Association raises five questions.[1] We will not reach the last four issues raised because we reverse on the basis of the first issue:

I. Was the trial court correct in declaring a reversion under a deed obligating life care, where it was admitted that proper care was rendered for seven (7) years, but the person requiring care died in an automobile accident, attributable to the negligence of an employee of the Defendant, a charitable institution?

## AGREED STATEMENT OF FACTS

The residence which is the subject of this litigation was acquired by Samuel C. and Carrie K. Ringgold in 1960. Samuel died before Carrie, vesting fee simple title to the subject property in her alone. The Ringgolds had two children, Roland C. and William Robert. Roland is the Plaintiff in this action. Robert was mentally retarded and required care and supervision.

Carrie served as a caretaker for her retarded adult son, but when she contracted cancer, she began to search for a source to continue the care for Robert that would be necessary on a permanent basis. At first, Carrie considered deeding the subject home to Robert. However,

---

**1.** The other questions raised by appellant are:

II. Does the doctrine of charitable immunity bar an action where the sole allegation supporting the complaint is an act of negligence, and the declaration of a reversion by the court is based solely on an act of negligence attributed to the Defendant, a charitable organization, through the doctrine of *respondeat superior* ?

III. Does the doctrine of estoppel or release apply, where the party seeking the benefit of the reversion negotiates a settlement and executes a general release of all parties with the insurer of the employee's vehicle; which settlement is not reported as required or authorized by the law of Decedants [sic] Estates?

IV. Does an absolute grant in the granting clause in a deed prevail over the habendum or reddendum clause in the deed where there is a repugnancy between the two?

V. If a declaration of a reversion was proper, was the Defendant entitled to a setoff for the cost of providing life care and making capital improvements to the premises in question?

she decided to deed it to her son, Roland, and did so on May 19, 1975. Roland later conveyed the property to the "Defendant", which deed gave rise to this litigation.

. . . . .

After the death of Carrie Ringgold, Roland began supervising the care of Robert, with the assistance of the Defendant. Roland found that he could not provide proper care for Robert and an arrangement was made in 1975 for a lease of the home to the Defendant for One Dollar ($1.00) per year, with the understanding that Robert would live in the home, with a caretaker to supervise him. The Defendant hired a caretaker by the name of Gertrude Quesenberry and provided funds necessary to operate the home and care for Robert. Two other handicapped citizens were added to the home between 1975 and 1977, to help operate the home on a more economical basis.

On July 27, 1977, Roland executed a deed of the property to the Defendant.... The supervision of the residence by Mrs. Quesenberry and the funding by the Defendant continued through March of 1984.

Because of her age and changes in the requirements set down by the State of Maryland, the Defendant determined in early 1984, that it would be necessary for Gertie Quesenberry to retire. The Defendant searched and found a residence for Gertie in Ridgely, Maryland, which was approximately 20 miles from the Ringgold residence, and Gertie planned for a formal retirement in April, 1984.

Over the eight (8) to nine (9) years which Gertie Quesenberry provided care for Robert, the equivalent of a mother/child relationship developed, and Robert became very attached to her. Significant discussions were had concerning the termination of this relationship because of the retirement, including a meeting with Robert's family. It was determined that Robert would be permitted to visit Gertie's new home prior to her departure, and to continue to visit her after her retirement.

. . . . .

Over the years, the Defendant made capital improve-
ments to the residence such as adding bathrooms, insulat-
ing the home, replacing various mechanical systems and
other capital improvements associated with maintaining a
residence. These expenditures approximated $24,851.91.
The Court found that the capital expenditures were not
done based on any agreement with the Plaintiff, and the
Defendant does not dispute this finding.

Robert and the other two residents contributed a sub-
stantial portion of their Social Security benefits, monthly,
towards their maintenance and care and the expenses of
operating the home, with the Defendant funding the
remaining expenses. Mrs. Boyd testified that no regular
rates were established for residents of the home, but that
money was raised to operate the home which, together
with Social Security benefits received from the residents
and State grants, constituted the budget. Gertrude
Quesenberry had been hired by Chesterwye, and it was
admitted that she was an employee thereof. She received
a small salary, room and board, and reimbursement for
the use of her automobile and any other out-of-pocket
expenses incurred in running the home on a day-to-day
basis.

Residents of the Ringgold home attended various out-
ings on a regular basis, such as shopping in Easton and
Annapolis, attending baseball games in Baltimore, visit-
ing the zoo and other recreational activities. Transporta-
tion would either be provided by Gertie in her own vehicle
or by a driver and vehicle from the Chesterwye Center.
Roland Ringgold was consulted on particularly long trips
such as vacation trips overnight to Florida or New York,
but was not consulted on the day-to-day activities de-
scribed above. Roland executed an agreement with
Chesterwye which granted permission for travel, and this
was admitted into evidence as Defendant's Exhibit 1.

Evidence was introduced by the Defendant that guide-
lines were established by the State of Maryland, which
provided that residents such as Robert were not to have

24–hour supervision and were to be permitted to exercise their own reasonable judgment on matters, and to develop a life style of self-sufficiency. The Plaintiff testified that it was his understanding that 24–hour care would be provided. Mrs. Boyd testified that Robert regularly made his own decisions concerning everyday activities, including the decision to visit Gertie Quesenberry's new home on the date hereafter described. The guidelines established by the State for living units such as this residence, followed by the Defendant, were admitted as Defendant's Exhibit 5.

On March 27, 1984, Robert decided to visit the proposed retirement home for Gertie Quesenberry. Gertie signed out from her employment duties at the Ringgold home on that day. Robert telephoned Mrs. Boyd and received permission to miss work that day at the Chesterwye Center in order to visit Gertie's new retirement residence. Mrs. Boyd agreed that Robert could miss work that day to make the visit. On the way to the home in Ridgely, Maryland, in Gertie's vehicle which was operated by her, Gertie and Robert were killed in an automobile accident. The Defendant stipulated that Gertie was the negligent driver in this accident.

Roland Ringgold testified that he was satisfied with the care provided by the Defendant for Robert through the day of the accident. And he even agreed that the care provided was excellent.

．　　　．　　　．　　　．　　　．

## I.

### Effect of Reversion

In a deed dated July 7, 1977, Ringgold conveyed the subject property to the Association in fee simple. The deed contained a designated "reverter clause" which provided:

In the event the said QUEEN ANNE'S CHAPTER, MARYLAND ASSOCIATION FOR RETARDED CITIZENS, INCORPORATED, or its duly and lawfully designated successor, shall fail, during the lifetime of WIL-

LIAM ROBERT RINGGOLD, properly to provide maintenance and care for said WILLIAM ROBERT RINGGOLD, then, and in that event, title to the real estate conveyed herein shall revert to ROLAND C. RINGGOLD, grantor herein. Grantee shall, however, be compensated at its regular rates for providing such maintenance and care.

Because of the reverter clause, what was actually conveyed by the deed was a fee simple determinable. This type of estate was previously described in *Mayor of Ocean City v. Taber*, 279 Md. 115, 127–28, 367 A.2d 1233 (1977) (quoting 1 H.T. Tiffany, *The Law of Real Property* § 220 (3rd ed. B. Jones 1939)):

"An estate in fee simple determinable, sometimes referred to as a base or a qualified fee, is created by any limitation which, in an otherwise effective conveyance of land, creates an estate in fee simple and provides that the estate shall automatically expire upon the occurrence of a stated event.

\* \* \* \* \* \*

No set formula is necessary for the creation of the limitation, any words expressive of the grantor's intent that the estate shall terminate on the occurrence of the event being sufficient.... So, when land is granted for certain purposes, as for a schoolhouse, a church, a public building, or the like, and it is evidently the grantor's intention that it shall be used for such purpose only, and that, on the cessation of such use, the estate shall end, without any re-entry by the grantor, an estate of the kind now under consideration is created.

\* \* \* \* \* \*

If one who has an estate in fee simple creates a determinable fee in favor of another, he has thereafter merely a possibility of re-acquiring the land by reason of the occurrence of the contingency named or indicated, this possibility being known as a possibility of reverter."

Having conveyed a fee simple determinable Ringgold retained a possibility of reverter:

A possibility of reverter is any revisionary interest which is subject to a condition precedent. When the owner of an estate in fee simple absolute transfers an estate in fee simple determinable, the transferor has a possibility of reverter. In other words, if one who has an estate in fee simple creates a determinable fee in another, he has thereafter merely a possibility of reobtaining the land by reason of the occurrence of the indicated contingency. Thus, where land is devised for a certain purpose, and it is the testator's intention that it shall be used for that purpose only, and that on the cessation of such use, the state shall end without re-entry by the grantor, a possibility of reverter arises.

*Ringgold v. Carvel*, 196 Md. 262, 272, 76 A.2d 327 (1950) (citation omitted).

The Association has admitted that the negligence of its employee, Gertie Quesenberry, was the cause of the fatal accident, yet it argues that a reversion of the property upon the happening of one act of negligence "contravenes any concept of equity especially after the provision of care for a period of seven years." We agree. "It is a familiar maxim that conditions subsequent are not favored in law, for the breach of such a condition causes forfeiture, and the law is adverse to forfeitures." *Sands v. Church, etc.*, 181 Md. 536, 542, 30 A.2d 771 (1943). Although the reverter clause in the deed expressly provided that if the Association "shall fail . . . properly to provide maintenance and care . . . then, and in that event, title to the real estate shall revert. . . .", we are not convinced that, on these facts, the trial court should have declared a forfeiture by the Association.

The question of what standard of care is required under the terms of a life-care deed appears to be one of first

impression in Maryland.[2] We note, however, that what is requested here (operation of a reverter clause) is very similar to the form of relief requested in another type of life-care case where rescission of the contract conveying the property is requested on the basis of failure of consideration. Our review of that type of "rescission" case indicates that:

The doctrine which obtains in the great majority of the states is that conveyances of property in consideration of agreements to furnish support are in a class peculiar to themselves, and that ordinarily, if the grantee in such a conveyance repudiates, or substantially fails to perform, his agreement, a cancelation of the conveyance, and a rescission, may properly be decreed.

*Owens v. Downs,* 121 Ind.App. 294, 98 N.E.2d 914, 917 (1951) (quoting, 112 A.L.R. 676, 677). *See also DeLance v. Hennessey,* 137 Vt. 214, 401 A.2d 903, 904 (1979) (to justify cancellation or rescission based on failure of consideration at least a substantial failure to perform must be shown); *Woolf v. Madison,* 250 Ark. 114, 464 S.W.2d 74, 75 (1971) (court considered whether the grantees violated in substantial respect the obligations to the grantor); *Peloquin v. Peloquin,* 75 R.I. 23, 63 A.2d 212, 214 (1949) (court considered whether the grantees faithfully and substantially carried out their obligations); *Craig v. Beach,* 303 Ky. 516, 198 S.W.2d 220, 222 (1946) (the law does not require perfection, a substantial compliance is sufficient).

We adopt "substantial compliance" as the standard to be applied in the case *sub judice* and we hold that there should be no reversion. Both parties agree that Robert received

---

2. In *Flanagan v. Flanagan,* 133 Md. 332, 335, 105 A. 299 (1918) the Court said "[t]here are cases where it is held, that where a grantor conveys property and the consideration is an agreement by the grantee to support, maintain and care for the grantor during his or her natural life, and the grantee *neglects or refuses* to comply with the contract, a Court of Equity will rescind the contract, strike down the deed and decree a reconveyance of the property." (Emphasis added.)

excellent care from appellant for years up until the date of his death. Indeed, the reason the Association allowed him to accompany Ms. Quesenberry on that fateful trip, which resulted in his untimely death, was a direct manifestation of the type of care and concern that they had demonstrated for Robert's well-being. The Association was aware that Robert had "the equivalent of a mother/child relationship" with Ms. Quesenberry and was concerned about how he would make the transition to a new primary caretaker when she retired. Ms. Quesenberry's negligence in driving her automobile is totally unrelated to the question of whether the Association properly provided maintenance and care for Robert.

The negligence involved in this case does not amount to a failure "properly to provide maintenance and care" of the kind envisioned by the reverter clause. Had the Association failed properly to feed, medicate, shelter and clothe Robert, or had it negligently provided these or other comparable services, then there could have been non-compliance such as would result in the operation of the reversion. Nonetheless, where, as in the case *sub judice,* the negligent act occurred while the grantee was attempting to attain, in an exemplary manner, the basic objective of the grant, to require reverter could thwart the basic purpose of this grant and would hold this grantee and others similarly situated to an impossible standard of perfection.

Even if we were to conclude that Gertie Quesenberry's negligence in this instance did reflect upon the Association's "care and maintenance", we are not convinced that this isolated incident (although admittedly resulting in the death of the primary beneficiary of the grant) is sufficient to trigger reverter in the face of seven years of "excellent care".

JUDGMENT REVERSED;

COSTS TO BE PAID BY APPELLEE.