51 A.3d 76

ARTHUR E. SELNICK ASSOCIATES, INC.

v.

HOWARD COUNTY MARYLAND, et al.

No. 01418, Sept. Term, 2010.

Court of Special Appeals of Maryland.

Aug. 30, 2012.

**668**

**670**

**672**

Terry B. Blair, Baltimore, MD & Mark J. Hardcastle, Columbia, MD, on the brief, for appellant.

Janet Bush Handy, Baltimore, MD & William F. Gibson, II, Potomac, MD & Gary W. Kuc, Ellicott City, MD (Kristin Case Lawrence, Douglas F. Gansler, Atty. Gen., Baltimore, MD, Daniel H. Scherr, Carney, Kelehan, Bresler, Bennett & Scherr, LLP, Columbia, MD, David J. Shuster, Brian S. Southard, Kramon & Graham, PA, Baltimore, MD, Kevin P. Kennedy, Shulman, Rogers, Gandal, Pordy & Ecker, PA, Potomac, MD, Adam C. Harrison, Harrison Law Group, Tow-

son, MD, Thomas J. Schetelich, Ferguson, Schetelich & Ballew, PA, Baltimore, MD, Joseph A. Lynott, III, Lynott, Lynott & Parson, PA, Rockville, MD, Kurt J. Fischer, Melissa L. Mackiewicz, DLA Piper, LLP (US), Baltimore, MD, Ira L. Oring, Neil Dubovsky, Fedder & Garten Professional Association, Baltimore, MD, Margaret Ann Nolan, Howard County Solicitor, Ellicott City, MD), on the briefs, for appellee.

Panel: EYLER, JAMES R.,* HOTTEN, JAMES A. KENNEY, III (Retired, Specially Assigned), JJ.

HOTTEN, J.

On July 17, 2008, appellant, Arthur E. Selnick Associates, Inc. ("Selnick"), filed a Complaint seeking declaratory, injunctive, and monetary relief against Howard County, Maryland in the Circuit Court for Howard County. After a lengthy procedural history, including removal to and remand from federal court and the joinder of numerous defendants, the circuit court ruled that the passage of time had converted a temporary easement into a perpetual easement pursuant to the thirty-year limit on possibilities of reverter under Md.Code (2010), § 6–101 of the Real Property Article ("R.P.").[1] Additionally, the circuit court ruled that it would not consider parol evidence in its review of the temporary easement or an

---

\* Eyler, James R., J., participated in the hearing and conference of this case while an active member of this Court, and participated in the adoption of this opinion as a retired, specially assigned member of this Court.

**1.** R.P. § 6–101, entitled "Thirty-year limit on possibilities of reverter and rights of entry created on or after July 1, 1969," states:

 (a) Section effective on July 1, 1969.—This section is effective on July 1, 1969, with respect to (1) inter vivos instruments taking effect on or after that date, (2) wills of persons who die on or after that date, and (3) appointments by inter vivos instruments or wills made on or after that date under powers created before that date.

 (b) Possibility or condition not valid after specified time.—If the specified contingency of a special limitation creating a possibility of reverter or of a condition subsequent creating a right of entry for condition broken does not occur within 30 years of the effective date of the instrument creating the possibility or condition, the possibility or condition no longer is valid thereafter.

agreement between Selnick and the State Highway Administration ("SHA").

Accordingly, the circuit court granted the defendants' motions to dismiss and motions for summary judgment, holding that the temporary easement had not terminated and reverted to Selnick. Instead, the easement had become a permanent easement as of September 6, 2004, thirty years from the grant of the temporary easement. The circuit court also held that Howard County had not constructively condemned the property over which the easement ran because the easement had not reverted to Selnick. Selnick timely appealed, presenting the following questions:

1. Did the Circuit Court err in ruling that *Md. Real Prop.Code Ann.* § 6–101 entitled, *"Possibility of Reverter,"* applied to convert the Temporary Easement into a Perpetual Easement?

2. Did the Circuit Court err in excluding consideration of parol evidence from the construction of the deed granting the Temporary Easement and Option Agreement between Selnick and the SHA?

3. Did the Circuit Court err in determining that no unconstitutional taking of Selnick's property occurred by the actions of Howard County?

For the reasons that follow, we answer the first question in the affirmative and second and third questions in the negative. Thus, we reverse the judgment of the circuit court and remand for an entry of a declaratory judgment that R.P. § 6–101 does not apply to easements.

## FACTUAL BACKGROUND

As this case was decided on summary judgment, we discern the following based on the pleadings. Kaiser Aetna developed the Route 100 Business Park ("Business Park") in the early 1970s in Elkridge, Maryland. On November 12, 1972, Kaiser Aetna recorded a subdivision plat that laid out the design of the Business Park and included a note that stated:

The area bounded by (1), (4), (15), [and] (19) is a revertible easement and a temporary entrance only. The ultimate permanent entrance will be at another location to be designated by the State Highway Administration. After the permanent entrance is built[,] the easement for access through the temporary easement will terminate and be void.

On September 6, 1974, Kaiser Aetna deeded land for the planned roadways in the Business Park to Howard County in fee simple. Kaiser Aetna, however, only deeded a temporary easement to Howard County over the portion of land that was to become part of Amberton Drive and serve as an entrance to the Business Park. The entrance was to be built as part of Howard County's Route 100 Road Extension Project. An exhibit to the deed contained a legal description of the land over which the temporary easement was to run, and the deed itself stated:

In addition to the foregoing, [Kaiser Aetna] does hereby grant to [Howard County] a revertible easement for a public road for use as a temporary entrance only, in, over and through the following described parcel, it being understood and agreed that upon completion of all improvement, grading and paving by the State Highway Administration of a permanent entrance to said Route One Hundred Business Park at the location described in Exhibit I hereto, and the availability thereof for use by the owners, occupants and tenants of the Route One Hundred Business Park and their respective employees, customers and invitees, the said revertible easement hereby granted will automatically terminate and be and become null and void and all rights therein shall automatically then revert to [Kaiser Aetna], its successors and assigns:

Temporary entranceway, 100 feet wide and approximately 453 feet long, leading from U.S. Route 1 to Amberton Drive, as shown on a Plat of Subdivision of Route One Hundred Business Park recorded among the Land Records of Howard County, Maryland on November 24, 1972 in Plat Book 24, folio 14, and more particularly described in Exhibit J hereto.

On September 30, 1975, Kaiser Aetna entered into an Option Agreement with the SHA, whereby SHA:

propose[d] to lay out, open, establish, construct, extend, widen, straighten, grade and improve as a part of the State Roads System of Maryland, a highway and/or bridge, together with the appurtenances thereto belonging, shown on the plans designated as Contract No. HO 362–3–771 for the improvement to Md. Rte. 100 in Howard County.

The agreement went on to state that:

it is hereby understood and agreed that the [SHA] will do the following: Amberton Drive now being used by the [Business Park] as its main access street into U.S. Route 1 is a temporary facility and will be replaced at the time of the improvement to this project with a new constructed tie-in at Hunting Mills Drive projected to U.S. Route 1 at the expense of the [SHA] and will replace in kind. (A dual within a 100' R/W).

A plat recorded on December 7, 1983 in the Land Records for Howard County that includes the parcel now at issue includes the following language:

* Note:

In accordance with understanding set forth in a letter from Kaiser Aetna to Mr. D.H. Fisher, State Highway Administration, dated June 28, 1972[,] the area bounded by the points 1 to 7, to 23, to 19, to 1, is a revertible easement and a temporary entrance only. The ultimate permanent entrance will be at another location to be designated by the State Highway Administration. After the permanent entrance is built the easement for access through the temporary entrance will terminate and be void.

Howard County constructed a four lane road, known as Amberton Drive, with a median and traffic signal over the temporary easement, and the public has used the road to access the Business Park since the county completed construction.

On December 28, 1983, Selnick purchased, in fee simple absolute, a lot in the Business Park. The purchase included the land comprising the temporary easement, and the deed

stated that the land was "[s]ubject to part of a Revertible Easement and a Temporary Entrance, as shown on [the] plat." The plat reiterated the "Note" from the December 7, 1983 plat.

On or about November 14, 1989, based on prior conversations, the local right of way agent for SHA, William Ravenscroft, informed Selnick that SHA was in the process of securing the right of way for a new entrance road into the Business Park. Mr. Ravenscroft informed Selnick that a new entrance would be constructed when a ramp leading from eastbound Route 100 onto U.S. Route 1 northbound was completed. The new entrance would make the temporary easement unnecessary, and SHA would provide an aesthetically pleasing permanent barrier to close the road over the temporary easement. On November 27, 1989, based on the discussions, Selnick granted SHA an option to purchase a portion of its property in conjunction with "improvements to Maryland Route 100 from I–95 to east of Maryland Route 713." The Option Agreement was later replaced by an almost identical agreement dated June 12, 1990; sections M and M1 of both agreements stated:

(M) It is hereby understood and agreed that [SHA] will do the following:

(M1) At the time Amberton Drive is closed SHA will provide a well defined break in the roadway to prevent all traffic from entry from the ramp.

The Route 100 Extension Project ended in 1998, but due to expenditure of funds, SHA did not construct a new entrance into the Business Park. SHA deferred construction "until traffic warrants closure/relocation of U.S. 1 Amberton Drive intersection." Selnick was advised of the deferral.

Since Selnick acquired its property in the Business Park in 1983, traffic over the temporary easement increased significantly. A 350 unit condominium and townhouse project used the temporary easement as the sole entrance and exit. Selnick noticed the increased traffic across the temporary easement and claimed to have lost a valuable tenant in its building

as a result of a lack of parking. Selnick then inquired as to Howard County's plans to construct a new entrance to the Business Park and close the road over the temporary easement.

In January 2008, Howard County advised Selnick that it was going to fund the design, acquisition, and construction of a new entrance to the Business Park, which would create a second point of access, triggering the termination of the temporary easement. Howard County, however, advised Selnick that it planned to continue to maintain the road over the temporary easement. In response, Selnick sought compensation from Howard County for condemning his property rights to the land covered by the temporary easement, which Howard County denied.

Selnick filed a Complaint in the Circuit Court for Howard County, seeking a declaration that Howard County constructively condemned the temporary easement or, in the alternative, that Howard County was no longer entitled to the temporary easement. Howard County filed a motion to dismiss, arguing, *inter alia*, that Selnick had failed to join as necessary defendants other property owners in the Business Park because their right to use the temporary easement as means of access could be affected by the outcome of the case. The circuit court granted the motion with leave to amend the complaint.

In response to the circuit court's ruling, Selnick filed an Amended Complaint, joining all ninety-one property owners who used Amberton Drive for access to their properties as necessary defendants. One such defendant was the United States Postal Service ("USPS"), who removed the case to the United States District Court for the District of Maryland. USPS then filed a motion to dismiss itself as a defendant under the doctrine of sovereign immunity, which was granted. The District Court then remanded the case to the circuit court because the basis of federal jurisdiction no longer existed, including in its remand an instruction that the case should not

be dismissed for a failure to join all parties, even though USPS was no longer a defendant.

With the case back in the circuit court, Selnick filed a Second Amended Complaint, which reiterated the allegations against Howard County and added counts against SHA for breach of contract and specific performance based on the 1990 Option Agreement. SHA filed a motion for summary judgment, and Howard County filed a motion to dismiss or for summary judgment, which several property owners incorporated in their respective motions to dismiss. Selnick filed a motion for partial summary judgment, in which it argued that Howard County had committed a *de facto* or constructive condemnation of the temporary easement when it planned to maintain the original access in addition to the planned second access to the Business Park.

After considering all the pending motions and argument, the circuit court concluded that the easement still existed because the triggering event—the construction of a new access road to the Business Park by SHA—had not occurred. The court also ruled that the passage of time had converted the temporary easement into a perpetual easement pursuant to the thirty-year limit on possibilities of reverter under R.P. § 6–101. The circuit court stated that it would not consider parol evidence to construe the grant of the temporary easement or the terms of the Option Agreement with SHA because the triggering events were clear and had not taken place. Finally, the court held that there was no taking and that there could be no claim for inverse condemnation because the reversionary interest had not yet reverted.

## STANDARD OF REVIEW

■ Although the defendants filed both motions to dismiss and motions for summary judgment, the circuit court decided that the issues could be "resolved by way of a motion for summary judgment." When the underlying facts are uncontested, as was the case here, the role of an appellate court is substantially similar whether reviewing the grant of summary

judgment or the grant of a motion to dismiss. *See Napata v. Univ. of Md. Med. Sys. Corp.*, 417 Md. 724, 732 (2011). In both instances, the standard is whether the trial court was "legally correct." *Compare Eng'g Mgmt. Servs. v. Md. State Highway Admin.*, 375 Md. 211, 229, 825 A.2d 966 (2003) ("The standard for appellate review of a summary judgment is whether it is 'legally correct.'") *with Sprenger v. Pub. Serv. Comm'n*, 400 Md. 1, 21, 926 A.2d 238 (2007) ("When reviewing the grant of a motion to dismiss, an appellate court is concerned with determining whether the trial court was legally correct.").

## DISCUSSION

## I. TEMPORARY EASEMENT

### A. Terms of the Grant

First, we discern that the deed granting the easement was not ambiguous. In *Gunby v. Olde Severna Park Improvement Ass'n*, 174 Md.App. 189, 238, 921 A.2d 292 (2007) (citing *Koch v. Strathmeyer*, 357 Md. 193, 742 A.2d 946 (1999)), we emphasized:

When interpreting a deed, courts often look to surrounding documentation to aid in understanding a grantor's intent if a provision is ambiguous, even in cases of summary judgment. *See Kobrine, L.L.C., et al. v. Metzger*, 380 Md. 620, 846 A.2d 403 (2004) (reviewing award of summary judgment and analyzing various plats, deeds and documents, both with indirect chain of title and similar deeds by original subdivision developer in order to determine intent of grantor, in case where lot owner and home owners association claimed that plat legend indicated lot had been retained for beneficial use of all homeowners); *cf. Calomiris v. Woods*, 353 Md. 425, 727 A.2d 358 (1999) (holding that lower court erred in awarding summary judgment based on extrinsic evidence to interpret release provision in mortgage contract where the provision was unambiguous). In *Calomiris*, the Court of Appeals, in reviewing an award of summary judgment, noted that an appellate court reviews *de novo* a trial court's

finding of ambiguity, but if it agrees with that finding [of ambiguity] it next "will apply a clearly erroneous standard to the trial court's assessment of the construction of the contract in light of the parol evidence received." *Id.* at 435 [727 A.2d 358].

Selnick argues that the lack of an end date conflicts with the characterization as "temporary," and thus requires the admission of parol evidence to incorporate a "reasonable time" requirement in the deed. Specifically, Selnick posits that without parol evidence, it is impossible to determine when or whether Howard County or SHA would ever construct a new permanent entrance to the Business Park. Selnick contends that if the circuit court's decision was correct, it "would *never* have been able to show its entitlement to the return of its property and the Temporary Easement, and certainly not within the 30 year life span for Possibilities of Reverter" in R.P. § 6–101. Selnick contends that the circuit court erred because its construction of the 1974 deed is directly at odds with the description of the easement as "temporary."

 Preliminarily, we note that the rules that govern contracts between individuals and private corporations also govern the construction of contracts between individuals and governmental entities. *Anne Arundel Cnty. v. Crofton Corp.*, 286 Md. 666, 673, 410 A.2d 228 (1980). "Under the objective law of contracts, a court, in construing an agreement, must first determine from the language of the agreement itself, what a reasonable person in the position of the parties would have meant at the time it was effectuated." *Id.* (citing *Benson v. Bd. of Educ. of Montgomery Cnty.*, 280 Md. 338, 349, 373 A.2d 926 (1977); *Slice v. Carozza Properties, Inc.*, 215 Md. 357, 368, 137 A.2d 687 (1958); *McKeever v. Washington Heights Realty Corp.*, 183 Md. 216, 220, 37 A.2d 305 (1944)). Language in a contract is ambiguous if it is susceptible to more than one meaning to a reasonably prudent person. *Calomiris v. Woods*, 353 Md. 425, 435, 727 A.2d 358 (1999). "In interpreting a deed whose language is clear and unambiguous on its face, the plain meaning of the words used shall

govern without the assistance of extrinsic evidence." *Drol-sum v. Horne,* 114 Md.App. 704, 709, 691 A.2d 742 (1997).

■ The deed granted an easement to Howard County until such time as there was a new access road to the Business Park. While the parties to the deed certainly could have included a duration limitation, they did not. R.P. § 4–105 states that "[u]nless a contrary intention appears by express terms or is necessarily implied, . . . every grant or reservation of an easement passes or reserves an easement in perpetuity." Here, the grant of the easement to Howard County was to become specifically "null and void" when a new entrance to the Business Park was constructed. Plainly, if this condition did not occur, the easement would continue.

Selnick directs our attention to *Anne Arundel County v. Crofton Corp.,* 286 Md. 666, 410 A.2d 228 (1980). In that case, the Court of Appeals addressed the duration of a contract between Anne Arundel County and a private land developer. *Id.* at 672–76, 410 A.2d 228. The contract did not expressly provide for a specific termination date. *Id.* at 673, 410 A.2d 228. The court noted that the facilities that were the subject of the contract were to be transferred to the county within sixty-six months of the date of the contract. *Id.* at 673–74, 410 A.2d 228. The contract also referenced contractual payments ending when the transfer occurred, suggesting that the contract "was to terminate upon the transfer of the facilities, but not later than [sixty-six months from the date of the contract]." *Id.* at 674, 410 A.2d 228. Other contract provisions, however, indicated that it was to terminate within the time reasonably necessary to fully develop the entire tract. *Id.* In light of the ambiguous termination date, the trial court looked to extrinsic evidence, which showed that the parties to the contract contemplated the agreement remaining in effect until the large property was fully developed. *Id.* Witnesses estimated that a realistic time estimate was fifteen to twenty years. *Id.* at 674–75, 410 A.2d 228. There was also evidence that the parties continued to perform under the terms of the contract for almost three and a half years after sixty-six

months from the date of the contract. *Id.* at 675, 410 A.2d 228. The Court of Appeals held that the sum of the evidence was "more than sufficient to support the trial court's finding that, at the time the ... [c]ontract was made, the parties intended that it remain in effect for 20 years, a period of time reasonably necessary for full development of the 1,257 acres[,]" and "[t]hat finding was not clearly erroneous." *Id.*

Selnick also relies on *Kiley v. First National Bank*, 102 Md.App. 317, 649 A.2d 1145 (1994). There, bank customers alleged that the bank, which obtained the customers' joint account as a result of its acquisition of all checking and savings accounts previously held by another bank, breached a contract by changing the terms of the customers' account. *Id.* at 332–40, 649 A.2d 1145. We discerned that even if there was a contract between the acquired bank and its customers, the putative contract was silent as to its duration. "Depending upon the intention of the parties, a contract, silent as to duration, may contemplate perpetual performance, performance for a reasonable time, or performance until the parties decide otherwise." *Id.* at 335, 649 A.2d 1145. However, "unless expressly provided, promises are not interpreted to require perpetual performance." *Id.* (citing *Williston on Contracts*, § 4:19, at 431 (4th ed.1990); *Restatement (Second) Contracts*, § 33, *Comment d*, at 94 (1981)). Instead, courts usually enforce " 'some period short of infinity' " when interpreting imprecise contracts. *Id.* (quoting *Williston*, § 4:19, at 434). We stated that courts ordinarily interpret a contract with an imprecise temporal term to indicate that the parties intended for the performance to occur within a reasonable time or to last for a reasonable time. *Id.* Likewise, if the parties contemplated a continuing performance, but did not specify a time provision in the contract, the contract mandates performance for a reasonable time and is usually terminable by either party at any time. *Id.* (citing *Williston*, § 4:19, at 442; *Restatement (Second) Contracts*, § 33).

Applying these principles to the issues in *Kiley,* we discerned that the bank continued to comply with the previous bank's terms for the customers' account for over five years.

*Id.* at 336, 649 A.2d 1145. We deemed such compliance to be "sensible and fair[,]" when viewed as "what a reasonable person in the position of the parties would have thought [the putative contract] meant." *Id.* at 335, 649 A.2d 1145 (citation omitted).

Finally, Selnick points to *Gregg Neck Yacht Club, Inc. v. County Commissioners of Kent County,* 137 Md.App. 732, 759, 769 A.2d 982 (2001), for the proposition that "[i]n construing the language of a deed, the basic principles of contract interpretation apply." (Citations omitted). " 'These principles require consideration of the character of the contract, its purpose, and the facts and circumstances of the parties at the time of execution.' " *Id.* (quoting *Chevy Chase Land Co. v. United States,* 355 Md. 110, 123, 733 A.2d 1055 (1999)) (other citations omitted). Extrinsic evidence may be admissible if the language of the grant is ambiguous, meaning that " 'if, when read by a reasonably prudent person, it is susceptible of more than one meaning.' " *Id.* at 760, 769 A.2d 982 (quoting *Calomiris,* 353 Md. at 436, 727 A.2d 358).

Selnick urges us to examine these cases and conclude that the 1974 deed, which conveyed "a revertible easement for a public road for use as a temporary easement only," is ambiguous. Selnick posits:

One may read the 1974 Deed as intending to be temporary in nature in the sense of not being perpetual. Or, one may read it as being temporary in the sense of the ordinary dictionary use of the term.[2] And, one may read the term in conjunction with the facts and circumstances surrounding its use and decide that the term as used in the 1974 Deed was intended to mean that the easement would last as long as the construction project within which the new entrance road was intended in 1974 to be constructed. The only possible use of the word "temporary" that must be excluded is the one accepted by the trial court—namely, that "temporary" may mean permanent or indefinite.

---

**2.** Selnick avers that the "ordinary dictionary" definition of "temporary" is "lasting or meant to last only for a limited period of time."

"The determination of ambiguity is a question of law, subject to *de novo* review." *Gregg Neck Yacht Club*, 137 Md.App. at 760, 769 A.2d 982 (citing *Auction & Estate Representatives, Inc. v. Ashton*, 354 Md. 333, 341, 731 A.2d 441 (1999)). When " 'interpreting a deed whose language is clear and unambiguous on its face, the plain meaning of the words used shall govern without the assistance of extrinsic evidence.' " *Id.* at 759, 769 A.2d 982 (quoting *Drolsum v. Horne*, 114 Md.App. 704, 709, 691 A.2d 742 (1997)).

In *Shallow Run Limited Partnership v. SHA*, 113 Md.App. 156, 167, 686 A.2d 1113 (1996), we addressed a grant of an easement for a temporary road to landlocked parcels. The conveyance provided that the easement would "be extinguished at the end of two (2) years or at such time as physical and legal access becomes available through [a certain parcel] ... *whichever shall occur last.*" *Id.* at 167, 686 A.2d 1113 (emphasis added). We held that the grant was "not vague and uncertain." *Id.* We noted that the precise location of the easement could vary, but that the parties "knew that to be the case" when they entered the agreement. *Id.* Nevertheless, it was "certain" that the easement would exist at a to be determined location, and that the easement would last for two years or until another access became available, whichever occurred later. *Id.* at 167–68, 686 A.2d 1113. Though extrinsic evidence was not an issue in that case, our determination certainly leads to the conclusion that parol evidence would have been unnecessary and, thus, inadmissible.

Here, in the context of the deed, we discern that "temporary" was not ambiguous, as it meant that the easement would last until a new access road was built. We believe this definition is consistent with Selnick's chosen "ordinary dictionary" definition of "temporary" as "lasting or meant to last only for a limited period of time." As such, we agree with the circuit court that extrinsic, or parol, evidence was not needed to clarify any ambiguity, so admission would have been improper.

## B. R.P. § 6–101 and Easements

On September 6, 1974, Selnick's predecessor in title, Kaiser Aetna, granted a "revertible easement" for a "temporary entranceway" to Howard County that "will automatically terminate and be and become null and void and all rights therein shall automatically then revert to [Kaiser Aetna], its successors and assigns" when SHA constructed another entrance to the Business Park. According to the circuit court, because the triggering event—SHA constructing a new entrance to the Business Park—did not occur within thirty years, the easement became a permanent easement as of September 6, 2004 under R.P. § 6–101 and its thirty-year limit on possibilities of reverter and rights of entry.

Selnick, as the current owner of the servient estate to the temporary easement, contends that the conveyance created a temporary easement alone, with the fee simple estate remaining in the grantor. As such, Selnick argues that the circuit court incorrectly applied R.P. § 6–101 to the easement. Howard County and other appellees counter that we should uphold the circuit court's decision because Kaiser Aetna granted a revertible easement, which, like a possibility of reverter in a fee simple determinable interest, is subject to R.P. § 6–101 and its thirty-year limit on revertible interests in land.

At the onset of our examination, it is worth noting that if R.P. § 6–101 applies to easements, the code section would also apply to the deed, even though not expressly referenced in the deed. *See John Deere Constr. & Forestry Co. v. Reliable Tractor, Inc.*, 406 Md. 139, 146, 957 A.2d 595 (2008) ("It is well-established in Maryland that 'laws subsisting at the time of the making of a contract enter into and form a part thereof as if expressly referred to or incorporated in its terms[.]' ") (citations omitted). We agree with Selnick that the grant of the easement at issue did not convey an estate in fee simple to Howard County, but rather granted an easement across the land owned by Kaiser Aetna in fee simple. Our analysis does not end there, however, because a Maryland court has not yet addressed whether R.P. § 6–101 applies to easements.

■ Selnick contends that the language of the statute, which expressly applies to possibilities of reverter and rights of entry, does not apply to easements, temporary or otherwise. Selnick points to the original version of the statute, which explicitly stated that it applied to restrictions on "a fee simple estate in land." In other words, Selnick asserts that the circuit court erred as a matter of law by applying R.P. § 6–101 to a grant by Kaiser Aetna of an easement because R.P. § 6–101 applies to fee simple determinable estates and fee simple subject to condition subsequent estates. Here, the grantor retained a fee simple estate, subject to an easement, and later deeded the estate in fee simple to Selnick, subject to the easement. Selnick also relies on several cases to support its position that the circuit court incorrectly applied the law to this situation. The cited cases define a possibility of reverter, and Selnick argues that for R.P. § 6–101 to apply, there must be a fee simple determinable estate. Finally, Selnick argues that the purpose of the statute was to limit the temporal longevity of a condition subsequent and to increase the alienability and marketability of land, similar to the purpose of the oft-dreaded rule against perpetuities.[3]

Appellees counter that Selnick's argument is a misinterpretation of the law that contradicts the thoughtful interpretations of other courts across the country and common sense in light of the public policy behind R.P. § 6–101. While Maryland courts have not had the opportunity to address whether possibilities of reverter and rights of entry apply to easements in addition to fee simple estates, other courts have concluded that they do. In its brief, Appellee NVR, Inc. ("NVR") directs our attention to Jon Bruce's and James Ely's Law of Easements and Licenses in Land, a treatise that Maryland

---

**3.** For a detailed discussion of the rule against perpetuities, *see Fitzpatrick v. Mercantile–Safe Deposit & Trust Co.*, 220 Md. 534, 155 A.2d 702 (1959). We further note that possibilities of reverter and rights of entry are not subject to the rule against perpetuities because the grantor holds the vested reversionary interest rather than a third party holding a future interest. *See Hopkins v. Grimshaw*, 165 U.S. 342, 355–56, 17 S.Ct. 401, 41 L.Ed. 739 (1897); *McMahon v. Consistory of St. Paul's Reformed Church*, 196 Md. 125, 134, 75 A.2d 122 (1950).

courts have recently cited with approval. *See, e.g., Potomac Elec. Power Co. v. Classic Cmty. Corp.,* 382 Md. 581, 590 n. 6, 856 A.2d 660 (2004) (quoting Bruce & Ely, *The Law of Easements and Licenses in Land* § 11:6 (" 'Upon revocation of a license, the licensee is not required to remove improvements made during the term of the license.' ")); *see also Kobrine, L.L. C. v. Metzger,* 380 Md. 620, 642, 846 A.2d 403 (2004) (citing Bruce & Ely, *The Law of Easements and Licenses in Land* § 8:34). In their treatise, Bruce and Ely explain that "[a] defeasible easement may be structured in such a way that the easement either (1) ends automatically upon the happening of the stated event, in which case it is a determinable easement, or (2) is subject to termination by an affirmative act of the servient estate owner whenever the specified event occurs, in which case it is an easement subject to a condition subsequent." Bruce & Ely, *The Law of Easements and Licenses in Land* § 10:3 (footnotes omitted). A defeasible easement may potentially have perpetual duration if the stated event or condition subsequent does not occur. *See id.*

NVR also relies on *Diaz v. Home Federal Savings and Loan Association of Elgin,* 337 Ill.App.3d 722, 272 Ill.Dec. 199, 786 N.E.2d 1033 (2002). In that case, the Second District Appellate Court of Illinois interpreted a grant to a railroad company that stated:

Provided however that if the said railroad shall not be constructed over and through said premises within two years or if the said Galena and Chicago Union Railroad Company or their assigns shall at any time hereafter cease permanently to use same railroad to be constructed and the same shall be abandoned or the route thereof changed so as to not be continued over said premises then and in that case the said land hereby granted shall revert to the said grantor his heirs or assigns.

*Id.,* 272 Ill.Dec. 199, 786 N.E.2d at 1042. That court discerned that the deed granted an easement, rather than an estate in fee simple, and that the terms of the deed expressly set forth when the easement would terminate—after two years if the

railroad was not built or, if constructed, at an undetermined time when the railroad company no longer used the land. *Id.,* 272 Ill.Dec. 199, 786 N.E.2d at 1042–43. The court recognized that "[w]hile possibilities of reverter often follow a fee interest . . ., they may follow other interests as well." *Id.,* 272 Ill.Dec. 199, 786 N.E.2d at 1042 (citations omitted). Furthermore, the court stated that "[e]asements may be held subject to future interests such as possibilities of reverter and rights of entry," so creating an easement subject to a possibility of reverter or right of entry "runs afoul of no rule of law." *Id.* (citing *Abrams v. Royse,* 211 Ill.App.3d 283, 155 Ill.Dec. 718, 569 N.E.2d 1329, 1331 (1991); *City of Urbana v. Solo Cup Co.,* 66 Ill.App.3d 45, 22 Ill.Dec. 786, 383 N.E.2d 262, 263 (1978)).

The circuit court found that the easement over Selnick's estate was a determinable easement with a possibility of reverter. The possibility of reverter would be triggered by SHA constructing a second access to the Business Park. According to Bruce and Ely, such determinable easements are "commonly used to provide temporary access to a dominant estate pending the completion of construction work on another access route." Bruce & Ely, *The Law of Easements and Licenses in Land,* § 10:3 (citing *Dotson v. Wolfe,* 391 So.2d 757, 758–59 (Fla.Dist.Ct.App. 5th Dist.1980) (access easement to endure "for so long as other suitable way of egress and ingress is not available")); *accord Jackson County v. Hall,* 558 S.W.2d 791, 792 (Mo.Ct.App.1977) (easement that "shall terminate if and when the two bridges located over the . . . right-of-way . . . are repaired, improved or replaced so as to accommodate wide and heavy loads"). Apparently, based on the authority cited by appellees, the circuit court was convinced to apply R.P. § 6–101 to the easement at issue in this case. We, however, are not so persuaded.

A comparison of R.P. § 6–101 to its predecessor, Md.Code (1957, 1968 Repl.Vol., 1969 Cum.Supp.) Article 21, § 143 (" § 143") is appropriate. As mentioned, R.P. § 6–101, entitled "Thirty-year limit on possibilities of reverter and rights of entry created on or after July 1, 1969," states:

(b) Section effective on July 1, 1969.—This section is effective on July 1, 1969, with respect to (1) inter vivos instruments taking effect on or after that date, (2) wills of persons who die on or after that date, and (3) appointments by inter vivos instruments or wills made on or after that date under powers created before that date.

(c) Possibility or condition not valid after specified time.—If the specified contingency of a special limitation creating a possibility of reverter or of a condition subsequent creating a right of entry for condition broken does not occur within 30 years of the effective date of the instrument creating the possibility or condition, the possibility or condition no longer is valid thereafter.

§ 143, entitled "Thirty-year limit on possibilities of reverter and rights of entry created on or after July 1, 1969," stated:

(a) A special limitation or a condition subsequent, which restricts a fee-simple estate in land, and the possibility of reverter or right of entry for condition broken thereby created, shall, if the specified contingency does not occur within thirty years after the possibility of reverter or right of entry was created, be extinguished and cease to be valid. Any estate of fee simple determinable or any fee-simple estate subject to a condition subsequent shall become a fee simple absolute if the specified contingency does not occur within thirty years from the effective date of the instrument creating the possibility of reverter or right of entry.

(b) Subsection (a) shall become effective on July 1, 1969, with respect to inter vivos instruments taking effect on or after that date, to the wills of persons who die on or after that date and to appointments made on or after that date, including appointments by inter vivos instruments or wills under powers created before such date.

Selnick points out that § 143 states that it applies to "a fee simple estate in land," and this language is not in R.P. § 6–101. After 1969, § 143 and related sections were recodified in Article 21, Title 6, which was "derived in its entirety from §§ 143–147 of former Article 21." Md.Code (1974), Title 6 of

the Real Property Article (comment to former Article 21, Title 6). Then, the General Assembly enacted Md.Code (1974), § 6–101 of the Real Property Article, which consisted of "new language derived from former Article 21, § 6–101 of the Code" and was substantially similar to R.P. 6–101. The only substantive difference between R.P. § 6–101 and Md.Code (1974), § 6–101 of the Real Property Article is that R.P. § 6–101(a) provides that the "section does not apply to an affordable housing land trust agreement...." Sections (a) and (b) of Md.Code (1974), § 6–101 of the Real Property Article are identical to sections (b) and (c) of R.P. § 6–101. Otherwise, it appears that the differences between § 143 and R.P. § 6–101 are the result of the revision of the Maryland Code, without substantive change.

Maryland case law has differentiated between a possibility of reverter and a right of entry as follows:

> The possibility of reverter is distinguished from the right of entry for condition broken in that it takes effect in possession automatically on the happening of the condition or event named in the creating instrument. But in the case of the right of entry, the grantor must elect to forfeit before the granted interest is terminated.

*Lovell Land, Inc. v. State Highway Admin.*, 408 Md. 242, 259 n. 5, 969 A.2d 284 (2009) (quoting 1 American Law of Property § 4.12). *See also Mayor of Ocean City v. Taber*, 279 Md. 115, 128, 367 A.2d 1233 (1977) (quoting 1 H.T. Tiffany, *The Law of Real Property* § 220 (3rd ed. B. Jones 1939)) ("'If one who has an estate in fee simple creates a determinable fee in favor of another, [the grantor] has thereafter merely a possibility of re-acquiring the land by reason of the occurrence of the contingency named or indicated, this possibility being known as a possibility of reverter.'"); *Mayor and Council of Rockville v. Walker*, 86 Md.App. 691, 697, 587 A.2d 1179 (1991) (citing 28 Am.Jur.2d Estates § 139, 160 (1966)) ("An estate in fee simple subject to a condition subsequent with a power of termination (or right of re-entry) is an estate that is granted to another but which the grantor may again acquire for breach of the condition under which it was granted. The estate does

not end automatically when the breach of condition occurs but only when the grantor terminates the estate by re-entering the land.").

 R.P. § 6–102 expressly applies to "all possibilities of reverter and rights of entry on estates of fee simple, existing before July 1, 1969" and requires the holder of such a right to file a notice of intention to preserve the right for the interest in land to continue to exist. " '[T]he meaning of the plainest language is controlled by the context in which it appears.' " *State v. Pagano,* 341 Md. 129, 133, 669 A.2d 1339 (1996) (quoting *Kaczorowski v. Mayor and City Council of Balt.,* 309 Md. 505, 514, 525 A.2d 628 (1987)). "Because it is part of the context, related statutes or a statutory scheme that fairly bears on the fundamental issue of legislative purpose or goal must also be considered." *Gordon Family P'ship v. Gar on Jer,* 348 Md. 129, 138, 702 A.2d 753 (1997) (citations omitted). Therefore, "not only are we required to interpret the statute as a whole, but, if appropriate, in the context of the entire statutory scheme of which it is a part." *Id.*

 Our goal when undertaking to interpret a statute is "to ascertain and effectuate the intention of the legislature." *Johnson v. Mayor of Balt. City,* 387 Md. 1, 11, 874 A.2d 439 (2005); *O'Connor v. Balt. Cnty.,* 382 Md. 102, 113, 854 A.2d 1191 (2004). The Court of Appeals has explained that " 'to determine that purpose or policy, we look first to the language of the statute, giving it its natural and ordinary meaning.' " *Maryland–National Capital Park & Planning Comm'n,* 395 Md. at 182, 909 A.2d 694 (quoting *State Dept. of Assessments and Taxation v. Maryland–National Capital Park & Planning Comm'n,* 348 Md. 2, 13, 702 A.2d 690 (1997); *Montgomery Cnty. v. Buckman,* 333 Md. 516, 523, 636 A.2d 448 (1994)). This is where "the search for legislative intent begins, and ordinarily ends[,]" *FOP, Montgomery Cnty. Lodge No. 35 v. Mehrling,* 343 Md. 155, 174, 680 A.2d 1052 (1996), because "[w]hen the statutory language is clear, we need not look beyond the statutory language to determine the Legislature's intent." *Marriott Emp. Fed. Credit Union v. Motor Vehicle*

*Admin.*, 346 Md. 437, 445, 697 A.2d 455 (1997). A court must not "add or delete language so as to 'reflect an intent not evidenced in that language' or construe the statute with 'forced or subtle interpretations' that limit or extend its application." *Motor Vehicle Administration v. Jaigobin*, 413 Md. 191, 197, 991 A.2d 1251 (quoting *Condon v. State*, 332 Md. 481, 491, 632 A.2d 753 (1993)).

▮▮▮▮ If we determine the statutory language to be ambiguous, then we "consider not only the literal or usual meaning of the words, but their meaning and effect in light of the setting, the objectives and purpose of [the] enactment." *Mehrling*, 343 Md. at 173–74, 680 A.2d 1052 (citing *Tucker v. Fireman's Fund Ins. Co.*, 308 Md. 69, 75, 517 A.2d 730 (1986)). In our construction, "we seek to avoid constructions that are illogical, unreasonable, or inconsistent with common sense." *Frost v. State*, 336 Md. 125, 137, 647 A.2d 106 (1994).

▮▮▮▮ Nevertheless, the Court of Appeals has cautioned that an inquiry into the statutory history is " 'in the interest of completeness . . . to look at the purpose of the statute and compare the result obtained by use of its plain language with that which results when the purpose of the statute is taken into account.' " *Jaigobin*, 413 Md. at 198, 991 A.2d 1251 (quoting *Harris v. State*, 331 Md. 137, 146, 626 A.2d 946 (1993)). The statutory history inquiry " 'is a confirmatory process; it is not undertaken to contradict the plain meaning of the statute.' " *Id.* (quoting *Mayor and City Council of Balt. v. Chase*, 360 Md. 121, 131, 756 A.2d 987 (2000)). "[A] court may not as a general rule surmise a legislative intention contrary to the plain language of a statute or insert exceptions not made by the legislature." *Coleman v. State*, 281 Md. 538, 546, 380 A.2d 49 (1977).

▮▮▮▮ An easement is "a non-possessory interest in the real property of another that can arise either by express grant or implication." *Clickner v. Magothy River Ass'n*, 424 Md. 253, 268 (2012) (citing *Boucher*, 301 Md. at 688, 484 A.2d 630). *See also Condry v. Laurie*, 184 Md. 317, 320, 41 A.2d 66 (1945). To constitute a grant of an express easement, the

instrument must contain the "names of the grantor and grant-ee, a description of the property sufficient to identify it with reasonable certainty, and the interest or estate intended to be granted." *Kobrine*, 380 Md. at 636, 846 A.2d 403. "If land is burdened by an easement, the owner of the servient estate is not divested of ownership of the property." *Gregg Neck Yacht Club, Inc.*, 137 Md.App. at 754, 769 A.2d 982 (citing *Greenwalt v. McCardell*, 178 Md. 132, 136, 12 A.2d 522 (1940)). "Rather, the easement area remains the property of the owner of the servient estate." *Id.* (citing *Greenwalt*, 178 Md. at 136, 12 A.2d 522). Here, the easement at issue was expressly grant-ed, and Selnick, as successor in title to the original grantor, was granted and holds ownership of the servient estate.

R.P. § 6–101 explicitly controls with respect to possibilities of reverter and rights of entry. In fact, the title of R.P. § 6–101 clearly provides that the code section is a "[t]hirty-year limit on possibilities of reverter and rights of entry created on or after July 1, 1969." Moreover, Title 6 of the Real Property Article, comprised of R.P. § 6–101 to § 6–105, is entitled "Rights of Entry and Possibilities of Reverter." Maryland courts have yet to address whether R.P. § 6–101 applies to easements, but as discussed, Maryland case law has expressly defined possibilities of reverter and rights of entry.

In a fee simple determinable estate, " 'where land is devised for a certain purpose, and it is the testator's intention that it shall be used for that purpose only, and that on the cessation of such use, the *estate shall end without re-entry by the grantor,* a possibility of reverter arises....' " *The Knights and Ladies of Samaria v. Bd. of Educ. of Charles Cnty.*, 113 Md.App. 656, 662, 688 A.2d 933 (1997) (quoting *Ringgold v. Carvel*, 196 Md. 262, 272, 76 A.2d 327 (1950)) (emphasis in original). In a fee simple determinable estate, when the estate is determined, "a fee simple absolute estate [is] reestablished in those entitled under the original grant-ors." *Mayor of Ocean City v. Taber*, 279 Md. 115, 129, 367 A.2d 1233 (1977). "It [is] not necessary ... to assert a claim to the fee simple absolute estate or to take any other positive

action," as the grantors "acquire[ ] a fee simple absolute estate by the realization of the possibility of reverter." *Id.* at 131, 367 A.2d 1233.

In a fee simple subject to a condition subsequent estate, "[t]he failure of a condition subsequent ... merely gives rise to a right of entry; the grantor does not obtain a fee simple absolute [estate] until he or she enters and retakes the land." *The Knights and Ladies of Samaria*, 113 Md.App. at 665 n. 4, 688 A.2d 933 (citing *Harmon v. State Roads Comm'n*, 242 Md. 24, 42–43, 217 A.2d 513 (1966)). Thus, in a fee simple determinable estate, the grantor's interest vests in fee simple absolute instantaneously with the failure of the limitation; however, in a fee simple subject to a condition subsequent estate, the grantor must affirmatively exercise his or her right of reentry after the failure of the condition subsequent to obtain title in fee simple absolute.

Simply, easements, which are non-possessory rights to use the land of another, do not generate, in the traditional sense, possibilities of reverter and rights of entry. Possibilities of reverter and rights of entry follow fee simple estates.

Title 6 of the Real Property Article promotes the alienability of land, through different means, by ensuring land owners' ability to use and sell land. An owner of a fee simple determinable estate or an owner of a fee simple subject to a condition subsequent estate owns the land in fee simple, but not fee simple absolute because there is a chance that the original grantor's possibility of reverter or right of entry may be triggered by an event or changed use of the property. The owner of an estate in fee simple determinable or fee simple subject to a condition subsequent can only grant that interest to another, with the original grantor still retaining the possibility of reverter or right of entry. *See* R.P. § 6–104. Like the rule against perpetuities, Title 6 of the Real Property Article limits such restrictions on use and alienability, promoting ownership in fee simple absolute. Not only are easements different interests altogether from possibilities of reverter and rights of entry, but the policy concerns present in possibilities

of reverter and rights of entry are not present in easements. Therefore, we hold that the circuit court erroneously held that R.P. § 6–101 applies to easements.

## II. 1990 Option Agreement

Selnick also argues that the 1990 Option Agreement was ambiguous, and therefore, the circuit court erred in refusing to allow parol evidence in its interpretation. To reiterate, language in a contract is ambiguous if it is susceptible to more than one meaning to a reasonably prudent person. *Calomiris,* 353 Md. at 435, 727 A.2d 358. If the language is ambiguous, "the court must then determine the intent and purpose of the parties at the time the contract was made, which is a question of fact." *Anne Arundel Cnty.,* 286 Md. at 673, 410 A.2d 228 (citing *H & R Block, Inc. v. Garland,* 278 Md. 91, 98, 359 A.2d 130 (1976); *Canaras v. Lift Truck Services, Inc.,* 272 Md. 337, 352, 322 A.2d 866 (1974); *Dorsey v. Hammong,* 1 H. & J. 191, 201 (1801)). If there is no express time for performance, the court will imply a reasonable time. *Id.* (citing *Evergreen Amusement Corp. v. Milstead,* 206 Md. 610, 617, 112 A.2d 901 (1955); *Coates v. Sangston,* 5 Md. 121, 130 (1853)).

The 1990 Option Agreement stated "[a]t the time Amberton Drive is closed SHA will provide a well defined break in the roadway to prevent all traffic from entry from the ramp." Selnick asserts that the language is ambiguous, so the circuit court should have admitted parol evidence to determine the intent of the parties. However, the language of the Option Agreement clearly sets forth that SHA's duty to construct the break in the roadway does not arise until Amberton Drive is closed. To insert a "reasonable time" requirement in the contract language would run contrary to the clear language of the Option Agreement and would add a new term to the contract, which is expressly forbidden by Maryland contract law. *See, e.g., Calomiris,* 353 Md. at 437, 727 A.2d 358 (parol evidence not admissible when formula is clear from the contract); *Jenkins v. Karlton,* 329 Md. 510, 526, 620 A.2d 894 (1993) (parol evidence not admissible to inject a condition not apparent on the fact of a promissory note). Because the clear

and unambiguous language of the Option Agreement set forth that SHA's obligations only arose when Amberton Drive was closed, the circuit court properly ruled that parol evidence to the contrary was inadmissible.

 Because Amberton Drive has not been closed, SHA's duty under the Option Agreement has yet to arise. Therefore, SHA cannot be in violation of the Option Agreement.

 On a related note, we point out that even if the circuit court had considered parol evidence to interpret and vary the terms of the option contract to create an obligation to close Amberton Drive by a certain date, Selnick's claim would have been time-barred. Pursuant to Md.Code (1991), § 12–202 of the State Government Article ("S.G."), "[a] claim [arising in contract against the state] is barred unless the claimant files suit within 1 year after the later of: (1) the date on which the claim arose; or (2) the completion of the contract that gives rise to the claim." [4] Before the circuit court, Arthur Selnick, as past president of Arthur E. Selnick Associates, Inc., filed a affidavit in support of Selnick's Motion for Summary Judgment. In the motion, Mr. Selnick asserted that SHA, through Mr. Ravenscroft, contacted him in April 1989 and informed him that it was interested in acquiring title to .238 acres of land Selnick owned in the Business Park. Mr. Ravenscroft proposed the Option Agreement, but Mr. Selnick expressed concerns about the closure of Amberton Drive. According to Mr. Selnick's affidavit, Mr. Ravenscroft told him in November 1989 that SHA was then in the process of securing a right of way for the new entrance road to the Business Park, which would be completed by 1993. Mr. Selnick asserted that Mr. Ravenscroft advised that once the new entrance was completed by 1993, SHA would close Amberton Drive "in a permanent fashion with a barrier to preclude it from being used as a means of ingress and egress into the [Business] Park." Mr. Selnick also averred that Mr. Ravenscroft told him that it was "unnecessary" to insert a clause in the Option Agreement to

---

4. To date, S.G. 12–202 has not been modified.

address the permanent closure of Amberton Drive. Mr. Selnick continued that no one from Howard County or SHA ever advised him that SHA had placed the construction of the new entrance road on hold, and it was not until October 2000 that he wrote a letter to SHA. In his letter, Mr. Selnick suggested that SHA might wish to purchase the land over which Amberton Drive ran, but that SHA never responded. Mr. Selnick concluded in his affidavit that he was "left to believe that [SHA] intended to carry forward with its original intent to construct the new entrance road at some time in the future" and that "[t]hroughout this period of time, Howard County continued to maintain the Temporary Easement and treat it as a public road based upon the original grant of easement in 1974." Mr. Selnick attached what he categorized as his "handwritten notes, correspondence[,] and agreements relating to the above negotiations."

If, *arguendo*, the circuit court considered Mr. Selnick's affidavit and the facts alleged therein, SHA was obligated to close Amberton Drive and construct a new entrance to the Business Park by 1993. Therefore, even allowing SHA until the end of the year in 1993, SHA's performance was overdue no later than December 31, 1994. Mr. Selnick did not write a letter until October 2000, and Selnick did not file suit in this case until July 17, 2008. Neither Mr. Selnick's letter nor the lawsuit were within a year of the latest possible date on which the claim in this case could have arisen.[5]

Based on the above, even if the court accepted the evidence Selnick proffered, Selnick is not entitled to the sought after relief because the complaints are time-barred and subject to dismissal pursuant to S.G. § 12–202. However, the court, in ruling on Selnick's request for a declaratory judgment determining whether the easement was temporary or perpetual, erred in holding that R.P. § 6–101 applies to easement. As

5. In its brief, SHA posits that the "completion" of the option contract under S.G. § 12–202 occurred on August 16, 1990 when SHA tendered Selnick $57,225 for the transfer of the deed to the optioned land, barring Selnick's claim on August 16, 1991.

such, we conclude that the easement continues as a temporary easement, which will end when Howard County or SHA constructs a second access road to the Business Park.

## III. Inverse Condemnation

Selnick also contends that the circuit court erred in its determination that Howard County's actions did not amount to an unconstitutional taking. In *College Bowl v. Baltimore*, 394 Md. 482, 489–90, 907 A.2d 153 (2006), the Court of Appeals defined inverse condemnation as follows:

> In *United States v. Clarke*, 445 U.S. 253, 257, 100 S.Ct. 1127, 1130, 63 L.Ed.2d [373] (1980), the Supreme Court characterized an inverse condemnation as a "shorthand description of the manner in which a landowner recovers just compensation for a taking of his property when condemnation proceedings have not been instituted." In that regard, the Court adopted the view of D. Hagman, URBAN PLANNING AND LAND DEVELOPMENT CONTROL LAW 328 (1971) that "[i]nverse condemnation is 'a cause of action against a governmental defendant to recover the value of property which has been taken in fact by the governmental defendant, even though no formal exercise of the power of eminent domain has been attempted by the taking agency.'" *Id. See also Reichs Ford v. State Roads*, 388 Md. 500, 511, 880 A.2d 307, 313 (2005). In determining whether governmental action constitutes an inverse taking, the Supreme Court has looked to whether the restriction "forc[es] some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *PruneYard Shopping Center v. Robins*, 447 U.S. 74, 83, 100 S.Ct. 2035, 2041, 64 L.Ed.2d 741, 753 (1980), quoting from *Armstrong v. United States*, 364 U.S. 40, 49, 80 S.Ct. 1563, 1569, 4 L.Ed.2d 1554, 1561 (1960).

Because it is in the nature of a generic description, an inverse condemnation can take many different forms—the denial by a governmental agency of access to one's property, regulatory actions that effectively deny an owner the physical or economically viable use of the property, conduct that

causes a physical invasion of the property, hanging a credible and prolonged threat of condemnation over the property in a way that significantly diminishes its value, or, closer in point here, conduct that effectively forces an owner to sell. *Amen v. City of Dearborn*, 718 F.2d 789 (6th Cir.1983) illustrates the last of those types. It was a class action based on inverse condemnation against the city of Dearborn, Michigan, by former residents of certain neighborhoods in the city. In order to coerce residents into selling their homes to the city, the city denied or unreasonably delayed building and repair permits or demanded expensive renovations as a condition to receiving a permit, demanded that residents perform maintenance and repairs not required by the building code, publicly announced that the area would be cleared and thereby inhibited residents from selling their homes to others, and allowed properties in the area to remain vacant and unprotected. The court concluded that, while none of those actions alone might have sufficed, the aggregate of that conduct did result in a taking.

In *Hardesty v. State Roads Commission*, 276 Md. 25, 343 A.2d 884 (1975), the Court of Appeals addressed whether the State Roads Commission's filing and later abandoning of condemnation proceedings for a scenic easement constituted a taking. The lower court held that it did not because there had been no physical appropriation or change in the physical character of that land. *Id.* at 29, 343 A.2d 884. The Court of Appeals reversed the lower court's finding that no taking had occurred, stating:

As noted in Nichols, *Eminent Domain* § 6.1(1) (3rd ed.1970):

Constitutional rights rest on substance, not on form, and the liability to pay compensation for property taken cannot be evaded by leaving the title in the owner, while depriving him of the beneficial use of the property.... [A] legal restriction upon the use of land may constitute a taking, although the title is unaffected and the land is physically untouched, and the same is true when the owner's enjoyment of the land is physically interfered with, although his legal rights remain

unimpaired. However, just how severe the interference with the owner's enjoyment of his property must be to constitute a taking ... is not a question which can be answered in such a way as to furnish a concise rule readily applicable to all cases likely to arise....

In stating that the weight of authority does not support the view that a physical appropriation is prerequisite to a "taking" of property in the constitutional sense, Nichols says at § 6.3:

The modern, prevailing view is that any substantial interference with private property which destroys or lessens its value (or by which the owner's right to its use or enjoyment if in any substantial degree abridged or destroyed) is, in fact and in law, a 'taking' in the constitutional sense, to the extent of the damages suffered, even though the title and possession of the owner remains undisturbed.

*Id.* at 31–32, 343 A.2d 884. Because the State Roads Commission had begun condemnation proceedings and the proceedings were pending for ten months, the Court concluded that Hardesty was deprived of the full use and enjoyment of his property to a degree sufficient to constitute a taking. *Id.* at 34, 343 A.2d 884.

▮▮▮▮▮ While Selnick may well have suffered from the continued existence of the easement across what is now his property, the actions of Howard County and SHA do not amount to a taking. "[T]he Fifth Amendment was not meant to protect property owners in their voluntary dealings with the government." *Janowsky v. United States*, 23 Cl.Ct. 706, 714 (1991), *rev'd in part and vacated in part on other grounds*, 133 F.3d 888 (Fed.Cir.1998) (citing *Armstrong v. United States*, 364 U.S. 40, 49, 80 S.Ct. 1563, 4 L.Ed.2d 1554 (1960)) (The purpose of forbidding uncompensated takings of private property for public use is "to bar Government from forcing some people alone to bear the public burdens which, in all fairness and justice, should be borne by the public as a whole."). Therefore, "[t]he defenses of easement and license

are grounded in the property owner's consent to allow his property to be used by others." *Janowsky*, 23 Cl.Ct. at 713. Here, even though the easement has not become perpetual or permanent under R.P. § 6–101, the temporary easement continues to exist until a new access road to the Business Park is built.

The easement across Selnick's property was voluntarily deeded to Howard County by Selnick's predecessor in title, Kaiser Aetna, so there could be no taking as long as the easement remained valid. *Calvert Assocs. Ltd. P'ship v. Dep't of Emp't and Soc. Servs., Emp't Sec. Admin.*, 277 Md. 372, 382, 357 A.2d 839 (1976) (no taking because state had entered in a lease with the property owner). *See also Janowsky*, 23 Cl.Ct. at 711 (no taking because government had license in property); *McElmurray v. Augusta–Richmond Cnty.*, 274 Ga.App. 605, 618 S.E.2d 59, 63 (2005) (no taking because government had easement and license in property). Selnick is bound by the easement Kaiser Aetna granted to Howard County. *See Columbia Hills Corp. v. Mercantile–Safe Deposit and Trust Co.*, 231 Md. 379, 381–82, 190 A.2d 635 (1963) (one who acquires title to land with constructive or actual notice of easement is bound by the easement). Likewise, as discussed above, his action attacking the validity of the easement is time-barred.

 Moreover, the expanded use and improvement of the road over the easement by Howard County and SHA does not amount to a taking. "Where land is dedicated for the purpose of a public street, the municipality acquires not only the easement of passage but also the right to grade and improve the surface of the street, and to lay sewers, drains and pipes for various utilities beneath the surface." *Levi v. Schwartz*, 201 Md. 575, 585, 95 A.2d 322 (1953). *See also Hiss v. Balt. & Hampden Passenger Ry. Co.*, 52 Md. 242, 251 (1879). "Maryland cases ... hold that an easement owner has a right to repair, maintain, and improve the easement." *Shallow Run L.P.*, 113 Md.App. at 169–70, 686 A.2d 1113 (citing *Wagner v. Doehring*, 315 Md. 97, 104, 553 A.2d 684 (1989)

(grant of right of way entitles holder to "maintain, improve, or repair the way to serve the purpose"); *Fedder v. Component Structures Corp.*, 23 Md.App. 375, 381, 329 A.2d 56 (1974) (owner of right of way may prepare, maintain, improve, or repair way)).

■ We also note that Selnick contends that its property rights are being substantially interfered with, resulting in economic harm. Selnick posits that the alleged harm "demonstrate[s] that a taking has already occurred, regardless of whether or not Howard County ever constructs the new entrance road, and regardless of whether or not it determines in the future to return Selnick's reversionary interest." As discussed above, a taking has not occurred. The problems Selnick details are the result of the unambiguous deed and option agreement. Such problems were reasonably foreseeable when Kaiser Aetna granted the easement, when Selnick purchased the property, and when Selnick entered into the option agreement. *See Shallow Run L.P.*, 113 Md.App. at 171–72, 686 A.2d 1113 (Uncertainty in whether property can be developed due an easement was, "or should have been, clearly discernable when the easement provision was negotiated and the contract executed."). Selnick's predecessor in title entered the deed, and Selnick entered the option agreement. In sum, Selnick "chose to enter into a contract [and take the land subject to a prior agreement] that clearly created potential problems in respect to [its] use of the . . . property." *Id.* at 172, 686 A.2d 1113. "People are permitted to enter into contract to their disadvantage." *Id.* A court will not relieve a party of a prior poor decision.

■ Finally, Howard County's alleged intentions in and of themselves to maintain the road over the easement even after there is a second entrance to the Business Park do not amount to a taking. Selnick directs our attention to the county's budget legislation and its various communications with members of the county government. However, there must be some governmental action that amounts to a taking of property for an inverse condemnation claim to succeed. *College*

*Bowl,* 394 Md. at 489, 907 A.2d 153; *Millison v. Wilzack,* 77 Md.App. 676, 683, 551 A.2d 899 (1989). As the events in this case were not fully developed because the matter was decided on summary judgment, Selnick has not yet demonstrated sufficiently definite or guaranteed actions to amount to a taking of the property. *See Hardesty,* 276 Md. at 32, 343 A.2d 884 (no taking for preliminary measures in process of appropriating land).[6] *See also Selby Realty Co. v. City of San Buenaventura,* 10 Cal.3d 110, 109 Cal.Rptr. 799, 514 P.2d 111, 117 (1973) ("If a governmental entity and its responsible officials were held subject to a claim for inverse condemnation merely because a parcel of land was designated for potential public use on one of these several authorized plans, the process of community planning would either grind to a halt, or deteriorate to publication of vacuous generalizations regarding the future use of land.").

## IV. Easement by Necessity

Even though not expressed in a deed, an easement may be created by implication. *Stansbury,* 390 Md. at 486, 889 A.2d 403. An easement may be created by "prescription, necessity, the filing of plats, estoppel, and implied grant or reservation where a quasi-easement has existed while the two tracts are one." *Boucher,* 301 Md. at 688, 484 A.2d 630 (citations omitted). "Easements by necessity, also called ways of necessity, are a 'special class of implied grants and have been recognized in this State for a good many years.'" *Stansbury,* 390 Md. at 486, 889 A.2d 403 (quoting *Shpak v. Oletsky,* 280 Md. 355, 360, 373 A.2d 1234 (1977); *Hancock v. Henderson,* 236 Md. 98, 102, 202 A.2d 599 (1964)). "[I]mplied easements by necessity arise from a presumption that the parties intended that the party needing the easement should have access over the land." *Calvert Joint Venture # 140 v. Snider,* 373

---

**6.** While *Hardesty* is a valuable resource for stating the generally applicable law, that case involved a "quick take," or "immediate entry," condemnation procedure, which is not the case here. *Hardesty,* 276 Md. at 33–34, 343 A.2d 884.

Md. 18, 39–40, 816 A.2d 854 (2003) (citing *Greenwalt,* 178 Md. at 136, 12 A.2d 522).

"[T]he doctrine of [easements by necessity] is based upon public policy, which is favorable to full utilization of land and the presumption that parties do not intend to render land unfit for occupancy." *Condry,* 184 Md. at 321, 41 A.2d 66. Yet, courts do not "affirm the existence of these easements lightly, as 'it is recognized, however, that grants of easements by implication are looked upon with jealousy and are construed with strictness by the courts.' " *Stansbury,* 390 Md. at 488, 889 A.2d 403 (quoting *Condry,* 184 Md. at 321, 41 A.2d 66). An easement by necessity " 'ceases to exist when the necessity for it ceases.' " *Id.* (quoting *Condry,* 184 Md. at 321, 41 A.2d 66). "Finally, 'mere inconvenience will not be sufficient to justify the finding of a way of necessity[ ] [because] [i]t is only in [the] case of strictest necessity, where it would not be reasonable to suppose that the parties intended the contrary, that the principle of implied easement can be invoked.' " *Id.* (citing *Condry,* 184 Md. at 322, 41 A.2d 66; *Zimmerman v. Cockey,* 118 Md. 491, 496, 84 A. 743 (1912); *Burns v. Gallagher,* 62 Md. 462, 472 (1884)).

"[E]asements by necessity must be created at the time of the initial grant of the property." *Stansbury,* 390 Md. at 488, 889 A.2d 403.

> If the way of necessity was not implied at the time of the grant . . ., it cannot be established by a subsequent necessity. In other words, the necessity must be determined from the conditions as they existed at the time of the conveyance. . . . Hence a remote grantee of land not being used at the time of the severance may nonetheless, when the use becomes necessary to the enjoyment of his property, claim the easement under his remote deed. . . . This rule is consonant with the generally held view that non-use alone is not sufficient to extinguish a way by necessity.

*Id.* at 488–89, 889 A.2d 403 (internal citations omitted).

Therefore, there are three elements that each must be satisfied for a landowner to successfully obtain an easement by necessity:

(1) initial unity of title of the parcels of real property in question; (2) severance of the unity of title by conveyance of one of the parcels; and (3) the easement must be necessary in order for the grantor or grantee of that property in question to be able to access his or her land, with the necessity existing both at the time of the severance of title and at the time of the exercise of the easement.

*Id.* at 489, 889 A.2d 403 (citing 28A C.J.S. Easements § 93 (2005)).

 Appellee Merritt–SB1, LLC ("Merritt") asserts that the foregoing requirements are satisfied. The first two prongs are met because Merritt's property and Selnick's property were subdivided from the original 191 acre tract of land that was developed into the Business Park. Merritt's argument regarding the third prong, however, is flawed. Merritt posits that if the temporary easement were to revert to Selnick or otherwise be extinguished, Merritt's property would be landlocked and unusable, frustrating the public policy of full utilization of land. Merritt ignores the fact that the temporary easement would be extinguished when Howard County or SHA constructs a new access road to the Business Park, which would also relieve the absolute necessity to use the road over the temporary easement for Merritt to reach its property. Thus, we disregard Merritt's contention that it has an easement by necessity across Selnick's property, and that the easement is not subject to Selnick's reversionary interest.[7]

**JUDGMENT OF THE CIRCUIT COURT FOR HOWARD COUNTY REVERSED. CASE REMANDED TO THAT COURT FOR FURTHER PROCEEDINGS CONSIS-**

---

7. Regardless, as was the case here, we note that "[o]n an appeal from the grant of a summary judgment which is reversible because of error in the grounds relied upon by the trial court[,] the appellate court will not ordinarily undertake to sustain the judgment by ruling on another ground, not ruled upon by the trial court, *if the alternative ground is one as to which the trial court had a discretion to deny summary judgment."* *Geisz v. Greater Baltimore Med. Center,* 313 Md. 301, 314 n. 5, 545 A.2d 658 (1988); *accord Lovelace v. Anderson,* 366 Md. 690, 696, 785 A.2d 726 (2001); *Three Garden Village Ltd. P'ship v. United States Fidelity & Guaranty Co.,* 318 Md. 98, 107–108, 567 A.2d 85 (1989).

TENT WITH THIS OPINION. COSTS TO BE PAID BY HOWARD COUNTY AND THE STATE HIGHWAY AD-MINISTRATION.